IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,
                    PLAINTIFF,

CASE NO. 07-032

V.

SHAHIYDULLAH A. BIN RAYMOND,
                    DEFENDANT,

## DEFENDANT'S PROPOSED FINDINGS OF FACT
## AND CONCLUSION OF LAW WITH CITATION OF AUTHORITY

Defendant Shahiydullah A. Bin Raymond, through self, Pro Se respectfully files the within Proposed Findings of Fact and Conclusions of Law.  Accordingly, defendant respectfully request that this Honorable Court apply the standard of  Haines v. Kerner, 404 U.S. 935, 92 S.Ct. 290, 30 L. Ed. 2d 248 to defendant in Pro Se.

### I. REASONS FOR RELIEF

**A.   The seizure and prolonged detention of Bin Raymond was unreasonable and did not conform to the standards set forth within the Fourth Amendment, therefore was unlawful.**

**(i)  There was no reasonable suspicion to further detain Bin Raymond after his license returned valid with no wants or warrants.**

**B.  The search of Bin Raymond and the canine search of his vehicle were unlawful.  It was conducted outside the scope of the Fourth Amendment.  The manner in which the search was conducted also denied Bin Raymond Equal Protection and Due Process, a violation of the Fourteenth Amendment.**

**C.  The initial seizure of Bin Raymond was arbitrary, without reasonable suspicion or probable cause.  The seizure was unconstitutional and violated the Fourth Amendment.**

**D.  The government failed to establish the required burden of proof.**

---

1. Suppression Hearing Transcript identified by date and abbreviated as (S.H.)
2. Defense Exhibits identified by alphabet/Govt. Exh. by number

**1.**

## II. <u>EXCLUSIONARY RULE</u>

For the above reasons, the exclusionary rule is applicable, and the evidence, i.e.

glock model firearm discovered inside the vehicle is fruits of the poisonous tree,

<u>Wong Sun v. United States</u>, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed 2nd 441

## <u>WHY WAS THIS STOP UNCONSTITUTIONAL</u> ?

### I. " Mr. Bin Raymond's protections from unreasonable seizures were violated when he was stopped and never told he was free to leave. "

A passenger inside of a vehicle co-owned by he and his spouse has an expectation

to be detained only for the purpose of the stopped to be fulfilled.  When the passenger

is told he has to drive and license is requested, after the license check returns valid with

no wants or warrants, the officer should end the stop.

If the officer conducts a criminal history check, after that check, the officer should

complete the stop, and the passenger should be free to leave.

Mr. Bin Raymond was detained two to over three times the amount of time necessary

to complete the stop.  Although he was told he would have to drive, he was never given

permission to leave.  Under the totality of these circumstances, these very acts make

this stop an unlawful seizure and prolonged detention.

### <u>(A.)  REASONABLE SUSPICION, WHERE</u> ?

### " The officer lacked reasonable suspicion to detain Bin Raymond beyond the time necessary to complete the stop. "

In this case, it is straight forward:  There were two men with arrest records, traveling the

interstate highway in a vehicle co-owned by one occupant and his wife, a black bag on

the rear seat in plain view; the other occupant unknowingly having a suspended license,

and returning to their home state, Ohio from Maryland.  Both are Pennsylvania's

neighboring state, respectively.

**2.**

## II.  " Mr. Bin Raymond's guarantee to be free from an unreasonable search was violated when the officer searched inside his pocket; and the canine search was conducted outside the scope of the Fourth Amendment. "

## " Mr. Bin Raymond was denied Equal Protection and Due Process because the canine sniff was not conducted on the exterior of the vehicle, and the search occurred before the search warrant was approved. "

*Terry* pat searches are to be conducted for the purposes of officer safety.  An officer is not permitted to search inside the garment unless the object is immediately recognizable as a weapon.

A canine sniff conducted during a traffic stop is lawful, but it is unlawful when that sniff occurs as a result of a prolonged detention.

The canine sniff violates the Fourth Amendment when the sniff occurs inside the vehicle resulting from the officer facilitaing or aiding that entry.

The canine sniff violates the Fourteenth Amendment when it is not conducted in the manner outlined by the United States Supreme Court, i.e. an exterior sniff.

## III.  " Mr. Bin Raymond was the victim of an unconstitutional traffic stop, unsupported by reasonable suspicion or probable cause. "

A stop that occurs as the result of a mistake of law can be found to be unlawful when no other reasonable officer could have made the stop.

The officer stopped Mr. Bin Raymond for a " left-lane " violation; but the statute that govern that law provides five exceptions that permit motorist use of the left lane.

The vehicle in which Bin Raymond was traveling met two of these exceptions.

These two execptions were unknown by the officer.

Given the law and the facts, no other reasonable officer could have objectively made the stop.

**IV. " The government's evidence fails to meet the burden of proof standard. "**

To satisfy the burden of proof standard, the government must present credible

evidence.

In this case, the government has presented one witness, a search warrant which was

applied for *after* the witness had searched, and a boilerplate dog certification.

The government's witness was acting under the color of state law when he searched

and subsequently applied for a search warrant.

## A. Unlawful Seizure and Prolonged Detention
### Analysis of facts and Case law

1.) On May 21, 2007, Defendant was a lone passenger with his cousin,
    Frank B. Sullivan, who was the driver in a van, co-owned by defendant
    and his wife, traveling westbound on the I-76/I-70 Pennsylvania Turnpike,
    approaching the Allegheny Tunnel at approximately 2:00a.m. **(S.H.) 4/28 Tr. pg.
    134:1-8,23-25, 135:1-11, 24-25,136:1-12; 141:8-14; 144:20-25,
    145:1-5  5/19 Tr. pg. 90:3-14 and Defense Exh. F,G,H,J & HH (pg.46)**

2.) Troopers Michael Volk and Robert Johnson of the Pennsylvania State Police
    were positioned at a stationary post at the eastern portal of the Allegheny
    Tunnel. Trooper Volk has only worked this area his entire sixteen year
    career, and much more often than Trooper Johnson.  **( (S.H.) 4/28 Tr. pg.
    18:19-24; 85:17-23; 153:14-16,25, 154:1; 156:16-25,157:1-2;
    5/20 Tr. pg. 60:11-24; 129:16-24; 130:2-9 and Defense Exh. D)**

3.) Tpr. Johnson had just pulled into the crossway stationary post prior to the
    approach of the van; he did not have time to place his patrol car in park;
    From the point he first saw it until it passed him, he observed the van for
    *3-5 seconds* . **(S.H.) 4/28 Tr. pg. 21:5-8** As soon as the van passed,
    Trooper Robert Johnson entered the stream of traffic and pulled behind the van
    in which defendant was traveling to effect a stop. The van was traveling the speed
    limit and was not speeding. **(S.H.) 4/28 Tr. pg. 110:10-16**.

4.) Trooper Johnson activated his patrol car lights and flood light to direct the
    van to stop. The canine, Marko could be heard barking. **(S.H.) 4/28 Tr. pg.
    21:19-20 and Defense Exh. E**.

5.) The driver, Sullivan pulled onto the left berm of the highway immediatedly
    after exiting the tunnel. This area is miles away from the nearest town.
    Pedestrians are prohibited from walking along the Pennsylvania Turnpike.
    **(S.H.) 4/28 Tr. pg. 94:16-25, 95:1-2**

6.) While wearing a military style uniform, Trooper Johnson approached the
     van, requested license, registration, and proof of insurance from Sullivan;
     and informed Sullivan that he was pulled over for driving in the left lane.
     He stated, " Pennsylvania law is you pass left and get back over." **(S.H.) 4/28**
     **Tr. pg. 66:1-15 and Defense Exh. E**

7.) Trooper Johnson became aware of defendant's presence in the passenger
     area as Sullivan retrieved the proof of insurance from defendant. **(S.H.) 4/28**
     **Tr. pg. 23:8-16; 136:7-12,24-25,137:1-6; 141:13-14 and Defense Exh. E and I**.

8.) Sullivan provided Johnson with his license and proof of insurance.

9.) Johnson ordered Sullivan to remain in the vehicle while he ran his license,
     while doing so, Tpr. Johnson conducted a criminal history check which revealed
     Sullivan had an arrest history.  No wants or warrants returned on Sullivan.
     **( See third line, pg. 47 of  Defense Exh. HH, and E )**

10.) About five minutes elasped before Johnson returned to the vehicle to inform
     Sullivan that his license was suspended and that defendant would have to drive
     which prompted Johnson to request defendant's license. Upon Tpr.'s exit from car,
     Marko could be heard barking again. Trooper Johnson praised Marko.
     **(S.H.) 5/19 Tr. pg. 45:16-25, 46:1-5 and Defense Exh. E,K,M,O and HH**
     **pg. 47**

12.) The defendant supplied Johnson with a valid drivers license; as Johnson
     returned to his patrol car to verify the status of defendant's license,
     with the use of his flashlight, he seen a black travel bag on the rear seat,
     but could not see nor verify its content. **(S.H.) 4/28 Tr. pg. 25:12-19; 5/20**
     **Tr. pg. 72:24-25,73:1-10 and Defense Exh. E**

13.) Johnson verified that defendant had a valid license, no wants or warrants
     were returned on defendant **( See fourth line, pg. 48 of Defense Exh. HH )** ;
     however, Johnson also ran an expansive criminal check upon defendant which
     revealed that he had an arrest history. After the no wants or warrants returned
     negative, the stop *could* have ceased ( approx. 8 minutes ), but Tpr. Johnson
     unecessarily spent additional time reviewing what correctional facilities defendant
     had been admitted to.  **(S.H) 4/28 Tr. pg. 23:17-25, 24:1-25,25:1-5;  26:20-24;**
     **140:9-11; 150:17-25; 152:20-25; 179:22-25,180:1-21 and Defense Exh.**
     **E, J, N,O & HH (pg. 33-36; 48-49)**

14.) Trooper Johnson had recieved all the above information at approximately 12
     minutes into the stop, and *should* have ceased the detention, but did not.
     **(S.H) 4/28 Tr. pg. 28:25,29:1-4; 183:3-12; 185:16-24;  5/20 Tr. pg. 52:12-21**
     **and Defense Exh. E,J and HH**

15.) During this period of time, at approximately 13 minutes into the stop,
     Trooper Volk had joined Johnson at the location of the stop.
     **(S.H) 4/28 Tr. pg. 165:19-22  Defense Exh. E and HH**

16.) At this time, Johnson requested Volk to prepare a consent to search form. **(S.H.) 4/28 Tr. pg. 25:9-11 and Defense Exh. E**

17.) At about 16 minutes and 30 seconds into the stop, Volk completed the consent to search form. **(S.H.) 4/28 Tr. pg. 26:20-24 and Defense Exh. E**

18.) After detaining defendant on matters unrelated to the traffic stop, Tpr. Johnson returned to the vehicle and requested Sullivan to exit the vehicle at which time Sullivan complied. **(S.H.) 5/19 Tr. pg. 19:7-13 and  Defense Exh. E**

19.) Johnson furthered ordered Sullivan to walk back toward his position at the front of his patrol car. Defendant remained in the vehicle. **Defense Exh. E**

20.) Johnson explained to Sullivan that his license was suspended and defendant would have to drive. Sullivan explained to Johnson that he did not know why his license was in suspended status and furthered explained that he had currently had a rental car provided by his own insurance company. **Defense Exh. E**

21.) While having Sullivan sign the warning citation, but before handing Sullivan his license, citation and bidding him farewell, Johnson asked Sullivan where he and defendant were traveling from. Sullivan stated, " Baltimore. " **Defense Exh. E**

22.) Johnson shook Sullivan's hand, told him to have a good evening, and as Sullivan turned to leave, Johnson called to Sullivan and asked, " Do you mind if I ask you one or two more questions ? ". Sullivan replied, " Sure. "  Defendant did not hear this exchange. **(S.H.) 4/28 Tr. pg. 182:15-24; 5/19 Tr. pg. 58:21-23; 5/20 Tr. pg. 69:16-25,70:1-25,71:1-8 and Defense Exh. E**

23.) Johnson asked a total of twenty-two questions and conducted a pat search of Sullivan. Among many of the questions, Johnson asked when did the two arrive; what time did they arrive; what were they there for; where did they stay; who did they see; and if they were together the entire time. Trooper Johnson asked if there were any drugs, weapons, or large sums of money inside the vehicle. Sullivan replied in the negative and acknowledged that he had an arrest record which confirmed what Johnson had already knew. During questioning, Trooper Johnson engaged in deceptive interdiction tactics. **(S.H.) 4/28 Tr. pg. 166:22-25,167:1-2; 184:12-21; 186:19-22; 5/19 Tr. pg. 23:17-21; 59:11-21; 61:25,62:1-15 and Defense Exh. E**

24.) After Sullivan submitted to Johnson's pat search,**(S.H.) 4/28 Tr. pg. 167:9-13,** and answered additional questions, Johnson told him to stand at the front of the patrol car, where Sullivan remained, under the watch of an armed, Trooper Volk, while Johnson returned to the vehicle.

**6.**

He did not observe nervousness, cellphones, air fresher/masking agents, [ the vehicle was not a rental car], there was no failure to maintain eye contact, no question arose regarding citizenship; and upon the pat search of Sullivan, there was not any discovery of cash or contraband. **(S.H.) 4/28 Tr. pg. 128:10-25; 129:1-15; 148:7-12,21-25, 149:1-7; 150:3-16; 5/20 Tr. pg. 70:3-16**
Tpr. Johnson had testified that: (1.) Point of Origin, (2.) Criminal Histories, and (3.) Conflicting Stories were the sum total facts he used to conclude that criminal activity was afoot. **(S.H.) 5/19 Tr. pg. 34:1-25, 35:1-25, 36:1-22**
Prior to reapproaching the vehicle to question defendant, he only began to "think" something was going on. He elaborated that "an observation and think" were different in his mind. **(S.H.) 5/19 Tr. pg. 41:1-25, 42:1-25, 43:1-25, 44:1-2; 5/20 Tr. pg. 52:19-25, 53:1-5,13-25, 54:1-8**
Sullivan was expected to remain where he stood and under Johnson's and Volk's authority and control.
**(S.H.) 5/19 Tr. pg. 44:18-24; 50:20-25,51:1-14; 5/20 Tr. pg. 49:13-25,50:1-3; 6/30 Tr. pg. 15:1-6,22-25,16:1-16; 24:13-25, 25:1-12 and Defense Exh. E**

25.) Trooper Volk began to ask Sulivan questions during this period of time.

26.) Upon reapproaching the vehicle for the fourth time, Johnson told defendant he would have to drive; without consent and without notifying defendant that the stop was complete, Trooper Johnson began to question defendant about how he knew Sullivan. **(S.H.) 4/28 Tr. pg. 179:17-25, 180:1-21; 5/19 Tr. pg. 22:18-24; 58:21-23; 64:5-8,14-17; 66:25,67:1-6; 68:24-25,69:1-6; 153:23-25,154:1-23 and Defense Exh. E**

27.) While stating that he could not hear defendant clearly, Trooper Johnson attempted to open the driver's side, passenger door while requesting that the defendant step outside the van, instead of waiting for consent to be granted. **(S.H.) 5/19 Tr. pg. 52:6-23; 58:4-11 and Defense Exhibit E**

28.) With the engine still running, the defendant climbed in the driver's seat, and was ready to leave. Trooper Johnson would not have permitted defendant to leave had he attempted to drive away. **(S.H.) 5/19 Tr. pg. 58:24-25, 59:1-7; 69:22-24 and Defense Exh. E**

29.) Defendant explained Sullivan and his relation. **Defense Exh. E**

30.) Trooper Johnson continued to ask defendant questions. And defendant answered that the two were in Baltimore. They were there to visit friends and eat food. They arrived in the afternoon and they hung out together. Johnson asked who did the defendant see when they were in Baltimore, and if defendant had ever been arrested. **(S.H.) 5/19 Tr. pg. 92:1-15,21-25,93:1-13 and Defense Exh. E**

31.) Defendant was polite when he asked Johnson what did the line of questioning
have to do with the traffic stop; Johnson would not and did not tell defendant
that the stop had been addressed, but in a commanding tone, repeated
some of his questions three times, insisting that the defendant answer his
questions.  **(S.H.)  5/19 Tr. pg. 10:14-25,11:1-9; 22:22-24; 94:5-24; 95:12-23;
136:8-15; 137:4-18; 146:1-25, 147:1-2 and Defense Exh. E**

32.) Trooper Johnson informed the defendant that he intended to search.
Johnson requested consent to search. The defendant denied consent.
**(S.H.)  5/19 Tr. pg. 71:11-16 and Defense Exh. E**

33.) Trooper Johnson then ordered the defendant to step outside of the vehicle
and stated that he did not need the defendant's permission to search.
**(S.H.) 5/20 Tr. pg 73:12-23; 75:9-14 and Defense Exh. E**

34.) Defendant stated that he did not want to step outside of the van.  Johnson
threatened defendant with extrication from the van if defendant did not
comply with the order. **(S.H.)  5/19 Tr. pg. 71:11-22; 76:2-6; 157:9-18;
5/20 Tr. pg 49:13-25, 50:1-3 and Defense Exh. E**

35.) Defendant began to alight from the vehicle; expressing his authority, Johnson
pushed the driver's door, outward and completely open. **(S.H.)  5/19 Tr. pg.
22:13-21; 97:1-9 and Defense Exh. E**

36.) The trooper followed with several successive orders. **1)** He ordered
defendant to leave his soda inside the vehicle.  **2)** He ordered defendant
to place his hands on the vehicle while being pat searched.  **3)** Johnson yelled to
Tpr. Volk, " Hey, call...", another officer, "... and tell him come over here! "
**4)** He told defendant to keep his hands up on the vehicle while he searched
the defendant's pocket's with a flashlight. **5)** He told Sullivan, " Stay put, you
hear ? "  **6)** He ordered the defendant to step back toward the patrol car.
**7)** and he told defendant to stand in front of the patrol car.  **(S.H.) 4/28 Tr. pg.
129:19-25,130:1-10;  5/19 Tr. pg. pg. 72:6-8; 74:8-14; 75;2-9; 77:24-25,78:1-8;
97:13-25,98;1-15 and Defense Exh. E**

37.) Defendant asked why the stop was being extended and Johnson replied
that the defendant was being evasive and that Sullivan and defendant's
story " didn't match up ". **(S.H.)  5/19 Tr. pg. 92:1-25,93:1-14; 131:10-25,132:1-22;
133:1-14; 138:1-8;139:1-11; 140:6-16; 141:2-10,16-22; 142:11-25,143:1-21
and Defense Exh. E**

38.) Trooper Johnson stated that Sullivan and defendant were not under arrest;
defendant asked twice if they could leave. Trooper Johnson replied,
" No, I'm going to search. "; Tpr. Volk created a " barrier " between the vehicle and
Sullivan and defendant.   **(S.H.)  5/19 Tr. pg. 98:20-25,99:1-16; 6/30 Tr. pg. 24, 25
and Defense Exh. E**

39.) A person is seized and thus entitled to challenge the government's action when officers, by physical force or a show of authority, terminate or restrain the person's freedom of movement through means intentionally applied.

40.) In Brendlin v. California, 127 S.Ct. 1145 (2007), the court reasoned that the " Mendenhall test " be utilized when the actions of the police do not show unambiguous intent to restrain or when an individual's submission to a show of authority takes the form of passive acquiesence.

The devised test in United States v. Mendenhall, 446 U.S. 544 (1980) determines that a seizure occurs if " in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. ".  The court continued, opinioning, " But when a person " has no desire to leave " for reasons unrelated to the police presence, the coercive effect of the encounter can be measured better by asking whether " a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter. "
Florida v. Bostick, 501 U.S. 429, 434 (1991)

41.) As stated in Brendlin, so is the case at bar, " Any reasonable passenger would have understood the officers to be excercising control to the point that no one in the [ vehicle ] was free to depart without police permission. "

42.) The defendant and driver were seized once the trooper activated his lights to effect a stop and the driver pulled to a stop.

43.) In this case, what is uniquely different is that after the trooper discovered the driver, Sullivan's license to be suspended, the trooper informed the defendant that he would have to drive and requested his driver's license, which was produced and found to be valid. ( see video 05:54 )
The Trooper *should* have and *could* have ended the stop as early as 8 minutes into the stop and at the *latest* ,12 minutes into the stop. This stop was unnecessarily extended by more than twice the time necessary to effectuate and have it completed.

44.) In United States v. Mosley, 454 F.3d 249 (3rd Cir. 2006), the court stated that the facts in United States v. Dortch, 199 F.3d 193 (5th Cir. 1999) were closely aligned with Mosley.

45.) Both of the aformentioned entail facts which are inarguably similar with the case at bar, with the exception that the defendant was passenger during the stop and became driver at the conclusion of the stop, and was the driver after the legitimate purpose of the traffic stop had been completed.
If the stop is found to be lawful, applying the Deluca test would be relevant;
Had defendant been permitted to leave the scene, the evidence would not have been discovered, United States v. Deluca, 269 F. 3d 1128 (10th Cir. 2001)

What is more, defendant did not consent to the encounter or the request for the search. As stated by the Mosley Court, " Fourth Amendment rights are personal rights "; unlike Mosley, however, the defendant had not only an expectation for himself not to be seized, or his person searched for that matter, but in addition, defendant had a personal expectation of privacy in the interior of the vehicle, and an expectation to not have the vehicle seized.

46.) Trooper Johnson requested that Sullivan exit the vehicle, a request that Sullivan could not decline according to Pennsylvania v. Mimms, 434 U.S. 106 (1977); The traffic stop had not come to a complete conclusion. Sullivan followed the directions of the officer. Defendant submitted to the authority by staying inside the vehicle.

47.) This court has consistently determined that a consensual encounter has ensued once an officer notifies the citizen he or she is free to leave. United States v. Skefferty, 2006 U.S. Dist. Lexis 32114 United States v. Hanton, 418 F. Supp. 2d 757 2006 U.S. Lexis 7558 United States v. Leal, 385 F. Supp. 2d 542 Also see United States v. Chatterpaul, 200 Fed Appx 147 (3rd Cir. 2006)

48.) In each, the court reasoned that the nature of the encounter is based upon the officer's words, actions, and demeanor. Tpr. Johnson's attempt to open the vehicle door conveyed control and authority. The only reason the door did not open was because it was locked.

49.) " A reasonable passenger would have understood this to mean that he was not free to leave or to terminate the personal encounter any other way, without advance permission. " Brendlin v. California id. (citation ommitted).

50.) In the case at bar, the trooper asked Sullivan if he would answer one or two more questions. These questions increased to more than a modest amount. Amid questioning, the encounter escalated to Trooper Johnson initiating a pat search; after Johnson had already placed his hands upon Sullivan,  he then requested for consent. After this pat search, the officer asked Sullivan to stand at the front of the patrol car, under the watch of another armed officer, vitiating the prior statement of his being free to leave and reactivating the seizure of Sullivan; during this entire exchange, defendant remained seized from the initial seizure.

51.) United States v. Brown, 448 F.3d 239 (3rd Cir. 2006), the court stated: the test for existence of a show of authority is an objective one: not whether the citizen perceived that he was ordered to restrict his movement, but whether the officers words and actions would have conveyed that to a reasonable person.

52.) Just as decided by the Brown Court, " This instruction would have conveyed to a reasonable person that he was being ordered to restrict his movement. "

53.)  United States v. Gayle, 2003 U.S. Dist. Lexis 26600, the court affirmed
the District Court's ruling which concluded that the trooper advised Gayle
that he was free to leave, but informed the passenger/owner that Gayle
could not operate the car since [ Gayle ] did not possess a valid driver's
license. The trooper returned the car registration to [ the passenger ]
and told her that she, too, was free to leave the scene, provided she
operate the vehicle.  The trooper then questioned the vehicle's owner
which resulted in a consensual search.
At no time during this exchange did the trooper limit the freedom of
movement of either [ Gayle ] or his companion.  Thus neither Gayle nor
[ his companion ] were arrested or otherwise restrained in any fashion.
Quite the contrary, **they** were advised **they** were free to leave.
(emphasis added)

54.)  United States v. Guerro-Espinoza, 462 F.3d 1302 (10th Cir. 2006);
United States v. Christy, 2008 U.S. Dist. Lexis 211885 (8th Cir. 2008)

55.)  In considering the totality of circumstances, Tpr. Johnson told Sullivan he was free
to leave. Then he asked Sullivan if he would answer one or two questions, but in
contrast, upon approach to defendant, Johnson *did not* ask defendant if he mind
answering any questions; instead, Tpr. Johnson repeated that defendant
have to drive. Tpr. Johnson asked how did defendant know Sullivan, who was now
the passenger and being kept outside of and some distance away from the vehicle,
under guarded watch of another armed officer.  Tpr. Johnson, himself, attempted to
open the vehicle's door during this re-approach, without consent.
The key was in the ignition, the engine running, and defendant climbed into the
driver's seat.  At this point, defendant was ready to leave.
Tpr. Johnson did not ever tell defendant he was free to leave or that he had
completed the traffic stop, but began intrusive questioning which when defendant
declined to answer, Tpr. Johnson used a harsh, commanding tone, being
insistent that the defendant was required to comply with the questioning.
**(S.H.) 5/19 Tr. pg. 153:23-25,154:1-23**   Arizona v. Johnson, 129 S.Ct. 781

56.)  This case is inapposite to  United States v. Wilson, 413 F.3d 382 (3rd Cir. 2005),
There, the court compared  the facts of that case to United States v. Drayton,
536 U.S. 194 153 L.Ed.2d  242, 122 S.Ct. 2105 (2002)
" There was no indication that [ the officer ] made any intimidating
movement or show of force or that he asked [ Wilson ] questions using
an authoritative tone of voice. " ( emphasis added)

57.)  There was not anything in Sullivan's answers to Johnson's questions that
would justify detaining the defendant for any such substantial law
enforcement interest.  That interest had been served with the issuance
of the warning citation.  Michigan v. Summers, 452 U.S. 692 101 S.Ct.
2587.  " As a practical matter [ defendant ] was under arrest "
(emphasis added)

**11.**

58.) Trooper Johnson stated his intention to search.  He followed his stated
intention with a request for consent to search which defendant denied.
Tpr. Johnson, by threat of extrication, removed defendant from the vehicle.

59.) It has been decided that police officers making a traffic stop may order
passengers out of vehicle *pending* completion of stop.  Maryland v.
Wilson,  519 U.S. 408, 117 S.Ct. 882, 137

60.) The traffic stop was completed and Tpr. Johnson's authority extinguished
for ordering defendant from vehicle absent <u>individualized</u>, articulable
suspicion of some crime.

61.) Any reasonable person being told by an officer to exit a vehicle or be
extricated, after denying consent to search, being told to keep his hands up on
the van while having his pockets searched, hearing that officer order another
officer to yet call for another officer, and being denied the freedom to leave after
requesting to do so, but instead being told, " No. I am going to search. " by that
officer would believe he was under arrest.  Arizona v. Johnson, 129 S.Ct. 781

62.) Accordingly, the trooper's prolonged detention was an unlawful seizure,
and therefore all fruits of the constitutional violation must be suppressed.
Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed 2nd 441

### i. Lack of Reasonable Suspicion
### Analysis of facts and Case law

63.) It is proposed by the government that the trooper had the requisite
reasonable suspicion to further detain Sullivan and defendant beyond the
completion of the traffic stop.

64.) The government cites the following : 1) Tpr. Johnson learned the vehicle was
registered to Mary Taylor, a person not present in the vehicle.   2) Sullivan
driving with a suspended license.   3) presence of a " black " bag.
4) Criminal records check revealed prior criminal history on both defendant and
Sullivan. 5) The defendant and Sullivan returning from Baltimore, Maryland.

Defendant will address each:  **1) Presence of owner:** The owner *was* present!
Tpr. Johnson did not elaborate as to how a spouse driving a privately, co-owned
vehicle is an indicator to reasonable suspicion of drug trafficking. Tpr. Johnson
testified at Preliminary Hearing that vehicle was defendant's, jointly owned by he
and his wife; and although Johnson denied this fact at the suppression hearing,
in addition, the affidavit of probable cause for the criminal complaint characterized
and described defendant as the owner; also noticeably absent within the body of
this same sworn statement is this alleged observation . **( see Defense Exh. O )**

**12.**

The record is silent on the vehicle's appearance. The officer could not and did not articulate *anything* that he would have associated with drug trafficking, such as aftermarket compartments, possibly missing seats, aftermarket tint, etc.
The record is silent on how and and if a registered owner is not present, it is reasonable suspicion to infer drug trafficking. Merely stating that it is without some credible, supportive facts is insufficient.  Many courts have rejected the absence of a third party on rental cars as an articulable fact for reasonable suspicion for drug trafficking, even when none of the occupants are listed as an authorized driver.
The evidence presents facts which demonstrate that this alleged suspicion was dispelled and abandoned approximately six minutes into the stop.

 **2) <u>Sullivan's suspended license:</u>** From the evidence, both occupants were surprised and in disbelief about the suspended status of Sullivan's license.
Tpr. Johnson failed to articulate how he would reasonably relate this discovery to drug trafficking or any criminal activity. Based upon the evidence, it does not appear that Sullivan operated the vehicle while knowingly being under suspension status; and such discovery has no bearing on the detention of defendant who possessed a valid driver's license, and should be properly excluded.

**3) <u>Presence of a " Black " bag</u>:** Without more, it does not establish reasonable suspicion.  Tpr. stated it was an indicator, but did not elaborate as to how it was an indicator; No description, other than a color. No size. No type. No suspicious bulk that would be associated with drug trafficking or a suspicion that it was even a counterfeit designer bag.  He did not associate the " Black " bag to any other observation that he would have connected to drug trafficking, such as multiple cellphones, nervousness, masking agents, etc; the court is prompted to ask, was it a  " Black " : *trash* bag, *book* bag, *duffle* bag, *carry-on* bag, *gym* bag, *golf* bag, *bowling ball* bag, *sleeping* bag, *shopping* bag, or *body* bag ?
Seeing *a bag* without more is not enough!
On this point, there is not any case law that would support such a vague fact as a valid indicator of reasonable suspicion.
Moreover, this alleged observation is completely absent on both affidavits of probable cause for the search warrant and criminal complaint. ( **Govt. Exh. No. 3 and Defense Exh. O** ) (fn.1)

**4) <u>Criminal History</u> :** The crux of the officer's reasonable suspicion is the prior arrest history of defendant; although none of which was indicative of drug trafficking, and appears to have been where the officer spent a great deal of time investigating, alone, it is insufficient, so the officer has attempted to add four other superficial, unexplained items to bolster and reinforce an otherwise infirm and absent, articulable fact of reasonable suspicion to continue the detention of defendant.

---

1. Although defendant could not present Sullivan to corroborate this fact, there were two black bags inside the vehicle. One on the rear seat and the other bag was on the floor. See Defense Exh. Q and O

5) **Point of Origin :** Tpr. Johnson stated the fact that the defendant traveled
from Ohio to Maryland and did not stay for an extended period was an indicator
to drug trafficking. However, the officer did not know from where the two men were
returning at the time that he began to prolong the stop which was after the license
query of defendant returned valid with no wants or warrants and before Tpr. Volk
arrived; Or in the alternative, after Tpr. Volk arrived and began to prepare a
consent to search form; Or in the alternative, before the officer began to prolong
the detention, all that was known to him was that the two men were returning to
Ohio from Baltimore. He did not know when they had arrived, what their business
was while down there, with whom they may have visited, or how long they had
stayed. The record is silent on either Baltimore, Maryland or Dublin, Ohio
being drug source or drug destination cities. Without explanation as to how it
would be reasonable suspicion of drug trafficking or criminal activity, this item,
even coupled with the others, does not rise to reasonable suspicion to extend the
scope of the initial stop.
Altogether, without further explanation by the officer as to how each or in sum total,
these items amount to reasonable suspicion, they simply equate to:
Two men with arrest records, traveling the interstate in a vehicle co-owned by one
occupant and his wife, with a black bag in the rear, the other occupant unknowingly
having a suspended license and returning to Ohio from Maryland. **(S.H.) 4/28 Tr.pg.
148:21-25, 149:1-2** Remove Sullivan from this equation and there is even less.

\* It should be noted by the court that this officer believes *any* citizen driving from
Baltimore at night is suspicious ( **S.H.) 4/28 Tr. pg. 147:23-25, 148:1-2**

65.) When asked what the <u>total</u> items of specific evidence were that would
have him conclude that criminal activity was afoot, on July 18, 2007,
Trooper Johnson unequivocally testified that 1) *Point of origin* 2) *Criminal history*
3) *Conflicting stories*  were the sum total facts that he used to conclude that
criminal activity was afoot. Tpr. Johnson's sworn statements and/or testimony were
inconsistent on these points. **Govt Exh. 3 (no mention of " Black " bag or
Criminal histories); Defense Exh. O (no mention of an absent owner or
" Black " bag);  Prelim. Hearing (no mention of " Black " bag, Sullivan's
suspended license, or absent owner of vehicle) (S.H.) 5/19 Tr. pg. 27:21-25,
28:1-9**

66.) Only two of the articulable facts of reasonable suspicion were itemized by
the trooper, himself; to further this point, out of the 22 questions that Johnson
asked Sullivan, none addressed his alleged suspicions about the suspended
license, the vehicle's owner, or the black bag.  The 26 questions posed to
Bin Raymond only related to point of origin and criminal history. Not one question
even remotely addressed the augmented, additional, alleged articulable facts of
reasonable suspicion.  **See Defense Exh. E**

67.) Additionally, Tpr. Johnson testified that prior to re-approaching defendant to
question him, he only began to " think " something was going on.
He elaborated that an " observation and think " were different in his mind.
This amounts to nothing more than a " *hunch* "  <u>United States v. Terry</u>, 1,
88 S.Ct. 1868

**14.**

68.) In Padilla v. Miller, 143 F. Supp. 2d 453 (3rd Cir.1999), the court stated
the only facts known to [ trooper ] at the time he instructed [ Padilla ] to
return to the rear of the vehicle and answer some questions were that
[ Padilla ] was from [ out of state ], had a criminal history, and was
traveling on an interstate highway. The court concluded, " These facts are
not sufficient to create an objective basis for extending the scope of the
traffic stop to a Terry investigative detention. "

69.) " Thus, unless [ Trooper Johnson ] had a reasonable and articulable
suspicion to continue the detention of [ occupants ] of the vehicle,
he violated their Fourth Amendment rights by not allowing them to
leave once the purpose of the traffic stop was satisfied. "

70.) While defendant recognizes that Sister Circuit rulings are not binding on
this court, defendant cites the following circuit rulings for purposes of
providing some legal analyses and conclusions of law in those circuits
when faced with similar facts.

71.) United States v. Christy, 2008 U.S. Dist. Lexis 21885 (8th Cir. 2008);
United States v. Smith, 263 F.3d 574 (6th Cir.2001);
United States v. Dortch, 199 F.3d 193 (5th Cir.1999);
United States v. Jones, 234 F.3d 234 (5th Cir. 2000);
Both Fifth Circuit cases were thoroughly analyzed by this Third Circuit
Court  of Appeals and cited in United States v. Mosley, 454 F.3d 249
(3rd Cir. 2006); United States v. Hutchinson, 471 F. Supp. 2d 497
(3rd Cir. 2007); United States v. Pierce, 2009 WL 255627 (D.Del);
United States v. Chatterpaul, 200 Fed. Appx. 147 (3rd. Cir. 2006);
United States v. Byrd, 155 Fed. Appx 58 (3rd Cir. 2005 );
Karnes v. Skrutski, 62 F.3d 485 (3rd Cir. 1995)

The court is invited to revisit  United States v. Leal, 235 Fed. Appx 937
(3rd Cir. 2007); there were fourteen factors that this court listed to justify
extending the stop. None of those factors were present or identified in this
case. There are not any factors that suggest or indicate a drug courier profile
that would give merit to the prolonged detention of Bin Raymond.
And just as in Karnes, all the factors together do not eliminate a substantial
portion of innocent travelers.

72.) In United States v. Gayle, 2003 U.S. Dist. Lexis 26600 (3rd Cir.),
The District Court found that [Gayle] presented the officer with a false
statement regarding his identity and produced an identification card
in the name of another person. The [defendant's] acknowledgement of
using two different names during the traffic stop was enough to provide
reasonable suspicion to extend the detention.

73.) United States v. Thibodeaux, 276 Fed. Appx 372 (5th Cir.2008);
United States v. Beck, 140 F.3d 1129, 1137-38 (8th Cir. 1998);

**15.**

74.)   In the case at bar, the facts are very similar and run parallel to the *Karnes* and *Padilla* case[s] and are not nearly enough like the *Leal* case.  The officer did not observe, smell, or feel anything that would provide an objective, articulable fact of reasonable suspicion.  He only engaged the defendant in conversation *during* the stop to determine ownership of the vehicle and his license status. Based upon the subsequent questioning, he appeared to be satisfied with the results of each.

75.) See also <u>Commonwealth v. Tyson</u>, (1143 Criminal 2004) ( Somerset County ) <u>Commonwealth v. Au</u>,  2009 Pa Super 231; 2009 Pa Super lexis 4480  **(fn.2)**

76.) The Court is urged to be unpersuaded by the articulable facts of reasonable suspicion supplied by the government which is an after the fact examination of the stop for reasonable suspicion, but instead accept the initial, sworn testimony of Trooper Johnson regarding what he identified as articulable facts of reasonable suspicion. **(S.H.) 4/28 Tr. pg. 186:7-18**

77.)   There was no reasonable suspicion to detain defendant and no probable cause for a search or seizure of defendant or the vehicle and its contents, therefore, the fruits of the unlawful search and seizure, i.e. the Glock model firearm must be suppressed.

### B. <u>Unlawful Search and Canine Sniff</u>
### Analysis of Facts and Case law

The Court is asked to take into consideration the defendant's unfulfilled objective to

have an expert testify on behalf of defense regarding canine handlers and canines.

It should be noted that upon conducting the stop, " Marko " could be heard barking

inside the patrol car.  When Tpr. Johnson exited the patrol car for the second time,

" Marko " barked again and Tpr. Johnson " praised " him.

Tpr. Johnson associate's " Marko's " barking with an indication of the presence of a

target substance.

78.) Trooper Johnson retrieved the canine, Marko from the patrol car. Marko is a police dog and is Johnson's partner. Johnson communicates with his canine partner in a foreign lanuage, and he praises Marko when he *indicates* to the presence of contraband. He *indicates* by scratching, barking or biting. **(S.H.)  5/19 Tr. pg. 163:19-25,164:1-11; 5/20 Tr. pg. 85:7-20 and Defense Exh. E**

---

Defendant requested stand-by counsel, Russell J. Heiple to provide him with caselaw which could be useful in this filing, and these Commonwealth cases were the cases which he advised the defendant to use.

see also, <u>United States v. Griggs</u>, 114 F. Supp 2d. 334

79.) Trooper Johnson approached the open, driver's side door of the vehicle with Marko. Johnson possessed a target aid/toy. **(S.H.) 4/28 Tr. pg. 38:16-24; 5/19 Tr. pg. 164:24-25, 165:1 and Defense Exh. E**

80.) Before conducting any search/sniff, without consent, Johnson reached insided the vehicle, and he at least turned off the ignition that defendant had left on. **(S.H.) 4/28 Tr. pg. 32:19-25; 5/19 Tr. pg. 165:2-5; 5/20 Tr. pg. 41:17-25, 42:1-25, 43:1-2; 73:21-25, 74:1-8,19-23; 75:4-7 and Defense Exh. E**

81.) Leaving the driver's door open, Johnson began the canine sniff from the left front of the vehicle to the open driver's door. " Marko " had half of his body inside of the vehicle, absent probable cause or consent, not withstanding the fact that: **1.)** the Tpr. pushed opened the vehicle door, never shut it and reached inside the vehicle. **2.)** Prompted the canine into the vehicle using cues and/or commands in a foreign language while possessing a stimulus, i.e. a training aid/toy that very well may have been narcotic scented. **(S.H.)  5/19 Tr. pg. 166:4-20** Trooper Johnson can be heard prompting the canine into the open driver's door by commanding him with "Zoeken " which means search. **(S.H.)  5/19 Tr. pg. 172:1-8; 173:5-12; 5/20 Tr. pg. 13:24-25,14:1-4,22-25,15:1-4; 99:1-15 and Defense Exh. E**

82.) Johnson can be heard speaking to Marko in a foreign language again while prompting Marko to enter into the vehicle.  Once Marko entered the vehicle, Johnson had repeatedly stated, " good boy ". **(S.H.) 4/28 Tr. pg. 33:21-24; 38:14-24; 5/19 Tr. pg. 173:18-20 and Defense Exh. E**

83.) Johnson removed Marko from the vehicle and continued the dog sniff from the inside, to the outside of the driver's side of the van, toward the rear and passenger's side of the van. **(S.H.)  5/20 Tr. pg. 39:2-25, 40:1-25, 41:1; and Defense Exh. E,O and P**

84.) Where Marko could be seen, he did not alert or indicate to the presence of a target substance. **Defense Exh. E**

85.) Trooper Johnson placed defendant in his patrol car to be transported to the Barracks.  It takes between 6 and 8 minutes to reach the Troop T Somerset barracks. Tpr. Johnson augmented the time that he said Sullivan told him to 7:00am, when conveying this information to Tpr. Volk. **6/30 Tr. pg. 68:24-25, 69:1-16 and Defense Exh. E**

86.) Trooper Johnson continued to attempt to receive consent to search from defendant. **Defense Exh. E**

87.) Defendant asked where did Marko indicate, Johnson stated, " On the center console. " **Defense Exh. E**

88.) When defendant mentioned that the dog entered the vehicle, Johnson replied, " The dog's trained to follow <u>orders. </u>" **Defense Exh. E**

89.) Upon arrival at the Barracks, Trooper Volk contacted Trooper Brock of
Asset and Forfeiture at approximately 2:30am; Johnson and/or Volk
conducted a search of the van before the search warrant was approved.
Tpr. Volk did not document the time when he contacted Tpr. Brock nor the
fact that he contacted him.  **(S.H.) 4/28 162:20-22; 6/30 Tr. pg.  64:23-25; 66:1-2;
8/17 Tr. pg. 14:3-18,25, 15:1-5; 19:11-14,20-25, 20:1-6,22-25, 21:1-9,19-25,
22:1-6,20-25, 23:1-4; 24:15-17; 25:2-10; 27:7-25,28:1,13-25,29:1-3**

90.)  " The Fourth Amendment protects people from unreasonable government
intrusions into their legitimate expectation of privacy. ",
<u>United v. Place</u>, 462 U.S. 696, 103 S.Ct. 2637 77 L.Ed. 2d 110,
<u>United v. Chadwick</u>, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481 53 L.Ed. 2d 538
(1977); further stating, " A  ' canine sniff ' by a well trained narcotics dog,
however , does not require opening [the luggage] "  (emphasis added)

91.)  " There are <u>three</u> requirements that must be satisfied for a plain-view search or
seizure.
**First**, the police must lawfully make an initial intrusion or otherwise be in a
position from which they can view/[sniff] a particular area.
**Second**, the officer must discover evidence " inadvertently ".
**Third**, it must be immediately apparent to the police that the items they
observe may be evidence of a crime, contraband or otherwise subject to
seizure ", <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 91 S.Ct. 2022,
29 L. Ed. 2d 564 (1971)

92.)  " Drug sniffs are designed, and if <u>properly conducted</u>, are generally likely,
to reveal only the presence of contraband. " [t]he fact that officers walk a
narcotics-detection dog around the exterior of each car at [a checkpoint]
does not transform the seizure into a search. ",  <u>Indianapolis v. Edmond</u>, 531
U.S. 32, 40, 121 S.Ct. 447, 148 L.Ed. 2d 333 (2000)

93.)  The United States Supreme Court held that the dog sniff did not infringe
upon the [motorist's] Fourth Amendment because the dog sniff was
conducted  " <u>*during*</u> a lawful traffic stop ", and use of narcotics-detection
dog was only to sniff <u>*exterior*</u> of vehicle,  <u>Illinois v. Caballes</u>, 543 U.S. 405,
125 S.Ct. 834, 160 L.Ed. 2d 842 (2005),

In the court's view, conducting a dog sniff would not change the character
of a  traffic stop...  otherwise executed in a reasonable manner, unless
the dog sniff itself infringed [respondent's] constitutionally protected interest
in privacy.
The court reserved judgment on the constitutional significance of sniffs
assumed to be more intrusive than a dog's walk *around* a stopped car.
While the court addressed the issue of the seizure of the luggage for the
purpose of conducting a canine sniff, the court was specific when stating
" A canine sniff... <u>does</u> <u>not</u> <u>require</u> <u>opening</u> [the luggage] "

**18.**

94.) Following this line of thought along with the Court's analysis in <u>Arizona v. Hicks</u>, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed. 2d 347, 55 USLW 4258 (1987),  The United States Supreme Court [held] that " merely looking/ [sniffing] at an object in plain view/[smell] is lawful, but ' *moving* ' or ' *disturbing* ' the object to investigate a reasonable suspicion is not. " (emphasis added)

95.) The court held that probable cause is required to invoke the " plain view "/ [plain smell] doctrine. Citing <u>Coolidge v. New Hampshire</u>

96.) In <u>United States v. Hutchinson</u>, 471 F. Supp. 2d 497 (3rd Cir. 2007), the court examined the consensus among the courts that have addressed the question of a canine's migration from outside a car or other container to the interior. The court has adopted Tenth Circuit opinion distinguishing the constitutionality of a dog sniff conducted on the interior of a vehicle and one which is presumably unconstitutional; the reasoning being grounded in the  " plain smell " doctrine, a logical extension of and analogous to, the plain view doctrine, citing  <u>United States v. Reed</u>, 141 F.3d 644, 649 (6th Cir.) 1998

97.) In the case at bar, First, the trooper did not conduct an exterior sniff of the vehicle *during* the traffic stop; and he did not conduct an exterior sniff of the vehicle with the canine prior to prompting the dog's entry into the vehicle. The canine *alerted/indicated* to a target substance while in the patrol car. Secondly, all three requirements announced in *Coolidge* have not been met for the rule announced in *Hicks*, therefore Hicks should have no application.
Thirdly, the Rule announced in Hicks should have no application since the positive sniff was aided/ achieved impermissibly by the trooper's manipulation of the vehicle door, reaching in the interior of the vehicle prior to the sniff while possessing a stimulus, i.e. aid/toy. **Defense Exh. E**

98.) The first requirement of *Coolidge* states: the [canine] must lawfully.... be in a position from  which they can [sniff] a particular area.
" Marko " had half of his body inside of the vehicle, absent probable cause or consent, not withstanding the fact that: 1) the trooper pushed open the vehicle door, was the last to touch the vehicle door before deploying the canine, reached inside the vehicle and never shut it.
2) while possessing a stimulus, training aid/toy prior to, during, and immediately after deployment, the trooper prompted the canine into the vehicle using cues and/or commands in a foreign language. The trooper facilitated the dog's entry <u>*before*</u> the dog allegedly detected the presence of contraband.

Certainly, if the trooper could not lean half of his body inside the vehicle and then employ a flashlight to " view " what would otherwise be hidden from his view, this reasoning should also apply to the canine, and its subsequent " sniff " from an *unlawful* vantage should be viewed as an infringement upon a constitutionally protected interest in privacy, i.e. an unlawful search; **(S.H.) 5/20 Tr. pg. 41:17-25,42:1-25,43:1-2** *And* Trooper Johnson conducted a warrantless search pursuant to <u>Arizona v. Gant</u>, 128 S.Ct. 1443 170 L.E.D 2d 274 Furthermore, Tpr. Johnson could have and should have permitted Bin Raymond to remain in the vehicle with the driver's door closed while he conduct the dog sniff;  he did not investigate his suspicion with " the least intrusive means ", <u>Florida v. Royer</u>, 460 U.S. 491, 103 S.Ct. 1319.

99.) This case is Distinguishable from <u>United States v. Hutchinson</u>, 471 F. Supp. 2d 497 (3rd Cir. 2007), In Hutchinson:

1. The officer was contacted by a task force officer regarding the stopped vehicle being suspected of transporting large quantities of marijuana prior to the stop.

2. The officer instructed defendant to exit the vehicle at the inception of the stop after he failed to produce driver's license, registration and proof of insurance. The vehicle was a rental car.

3. The officer observed marijuana debris on the front seat as the defendant exited the vehicle.

4. The officer did not aid defendant's exit from the vehicle.

5. There is no evidence of record that a pat search was conducted upon the defendant prior to being escorted to the front of the officer's patrol car.

6. The officer did not request consent to search nor did he express to defendant that he was going to search or perform a canine search.

7. There is no evidence of record that the officer used a harsh tone or commanding tone while questioning defendant.

8. The questioning was conducted *during* the traffic stop, as was the canine sniff. The officer did not reach inside the vehicle before the sniff.

9. The canine entered through an open window which was not touched or manipulated by the canine handler in any way. The car door remained shut.

10. There is no evidence of record that the canine handler used cue/commands in a foreign language and/or possessed a training aid/toy while conducting the exterior sniff, narcotic scented or not.

**20.**

11. And the evidence of 220 pounds of marijuana being discovered in duffle bags, one of which was on the back seat in which the canine alerted on upon entry through the open window, supported the conclusion that the canine sniff was untainted.

100.) This case is Distinguishable from <u>United States v. Pierce</u>, 2009 WL 255627 (D.Del) on several points. In *Pierce*,

1. The officer made several "plain view" observations of the interior of the vehicle *during* the course of the stop.

2. The vehicle was a rental.

3. The officer questioned the defendant *during* the stop.

4. The officer asked the [defendant] to get out of the vehicle solely to conduct a pat down search for weapons *during* the stop.

5. When the defendant got out of the vehicle, <u>he left the door open</u>.

6. The officer did not request for consent to search.

7. There is no evidence of record that the officer aided the exit of defendant or touched the vehicle's door in any manner.

8. The officer did not threaten defendant with extrication from the vehicle, or otherwise use a harsh commanding tone while questioning defendant.

9. During the pat search, the officer discovered through " plain feel " what he believed to be paper money which defendant confirmed when he removed several stacks of cash from his pocket.

10. Upon the defendant's exit of the vehicle, the officer did not voice any stated intention to search, or to perform a canine sniff/search.

11. While the license was being checked, the canine team arrived and conducted the canine sniff/search.

12. The canine was legallly present in a position from which and when it sniffed the dashboard via an open window *before* it entered the open door.

13. The canine handler walked the canine around the vehicle's exterior.

14. There is no evidence of record that the canine handler reached inside the vehicle prior to deployment.

15. There is no evidence of record that the canine handler possessed a training aid/toy, narcotic scented or not, before, during, and immediately after the dog's entry into the vehicle, or that the canine handler used cue/commands.

**21.**

16. And the evidence of one kilogram of cocaine discovered in the glove compartment supported the determination that the canine sniff was untainted.

101.) In particularly, the canine handler walked the canine *around* the vehicle's exterior. The court concluded, the canine sniffed the dashboard of the vehicle's interior, poking his nose through a partially open window, but did not enter the car. It was not until after these events that the dog hopped through the open driver's door and sniffed the interior of the car. United States v. Leal, 385 F.Supp 2d 542 (3rd 2006); United States v. Peralez, 526 F.3d 1115 (8th Cir. 2008); United States v. Olivera-Mendez, 484 F.3d 505 (8th Cir. 2007);

102.) This case is more analogous to United States v. Winningham, 140 F.3d 1328 (10th Cir. 1998)    In the case at bar,

1. The officer only observed an overnight travel bag within the interior of the vehicle *during* the course of the traffic stop.

2. *During* the course of the stop, the officer only questioned defendant regarding his relation to Mary Taylor, defendant's wife and co-owner of the vehicle, and whether or not he had a valid driver's license.

3. The officer did not ask defendant to get out of the vehicle and conduct a pat search *during* the stop.

4. *After* the purpose of the stop had been completed, the officer attempted to question defendant, using a harsh, commanding tone while insisting on answers.

5. After defendant would not answer the questions, the officer requested consent to search. Defendant denied consent.

6. The officer stated his intention to search to the vehicle.

7. The officer demanded that defendant exit the vehicle under the threat of extrication *after* the purpose of the traffic stop had been fulfilled.

8. The officer aided and/or assisted the defendant's exit by pushing open the vehicle door and leaving it; an act done solely for the purpose of facilitating the canine's entry into the vehicle. An act intended by the officer. The officer's hands were the last to touch the vehicle door through means intentionally applied, prior to the dog sniff/search.

9. Upon exit from the vehicle, Tpr. Johnson ordered defendant to place his hands upon the van and leave them there, and he told Sullivan, " Stay put, you hear. " , orders that prevented defendant and/or Sullivan from shutting the door.

22.

10. During the pat search, which occurred *after* the purpose of the traffic stop had been completed, while looking inside defendant's pocket with a flashlight, the officer made no discovery of any item that would justify his stated intention to search and deploy the canine.

11. The canine was present at the inception of the stop; the officer did not employ the use of the canine until approximately 10 minutes after the purpose of the stop had been fulfilled, and sixteen minutes after the license, wants and warrants check returned clear.

12. Tpr. Johnson possessed a stimulus, i.e. an aid/toy, narcotic scented or not, while conducting the deployment and reached inside the vehicle.
When Tpr. Johnson threw the stimulus inside the vehicle, he did not do so when he testified that he did; **( See Defense Exh. E )**
If it occurred, he threw the stimulus inside the van before the " Fast Pass " began while Tpr. Volk blocked the camera view and/or while Johnson reached inside the van.

13. When the dog was utilized, the officer failed to conduct an exterior sniff *before* the dog's entry; and the dog's improper entry was prompted by the officer.

14. Tpr. Johnson used cue/commands in a foreign language and the canine's improper entry was aided, facilitated and prompted by Tpr. Johnson's actions.

In Winningham, the officer's themselves opened the door, allowing the van to sit on the side of the highway with the [door] open... A desire to facilitate a dog sniff of the van's interior.

Again, although Sister Circuit rulings are not binding on this court, the case law in the aforementioned cases indicate that the proper manner to conduct the canine sniff is **always** a walk *around* the exterior of the vehicle.

## " EVERY DOG THAT HAS A TAIL WAGS IT'S TAIL "

### Unreliability of the canine and Tpr. Johnson's inability to recognize an alert and indication

103.)  It seems the court is being asked by the government to ignore the facts and just apply the law. The government has failed to provide any corroborative, credible evidence that " Marko " actually alerted or indicated to the presence of narcotics in the interior of the vehicle, thereby establishing probable cause.

104.)  The government offers a boilerplate certification which does not include or explain how the canine "alerts" or *indicates* to the presence of narcotics.

All that is available for the court to make a determination on this issue are Tpr. Johnson's testimony, which on this and other material points should be viewed with skepticism and as less than credible; and a video which illustrates the canine barking on four occasions; *Twice* while in the patrol car prior to deployment, once while inside the van, and once along side the van.

105.)  Tpr. Johnson did not state in his affidavit of probable cause to the Magistrate Judge that the canine "alerts" to the presence of narcotics by wagging his tail or any such action. He applied for and obtained the search warrant based upon an indication, not an *alert*. To grant the government refuge in an assertion outside the four corners of the affidavit would render the oath and affirmation in the probable cause standard meaningless, and the Fourth Amendment would contract a reprehensible deformity and recede into insignificance. ( S.H.) 5/20 Tr. pg. 18:2-9

In this case, most importantly, there is no credible, clear evidence that the canine alerted prior to entry into the vehicle. The canine wagging it's tail as an alert is no more reliable than is it's bark as part of an indication.
This dog's "alert" on Bin Raymond's vehicle is as ficticious as an infallible canine, and Tpr. Johnson's statement, " There's no such thing as a false alert. "
On May 21, 2007, " Marko " was a mere show dog. There was no alert!
In this case, there is a dog reacting to inducements by it's handler.
Johnson misused the dog to attempt a coerced consent to search from Bin Raymond, and falsely furnished a manufactured probable cause.
" The Fast Pass " not only gets Marko engaged, but by nature, it gets the dog excited.  Every dog with a tail wags it's tail, when excited.
When Tpr. Johnson spoke to Tpr. Volk, he did not say, " There's definitely something there because Marko alerted or indicated. ", or any words in such context.  He said, " There's definitely something there because he said 7:00 in the morning and he said the evening. "
The Trooper knows that all he need do is pull Marko out, get him by Bin Raymond's vehicle, possess Marko's " toy ", i.e. a stimulus and give him commands like  " Zoeken ", both of which will get him excited, and ' PRESTO ', we have probable cause.

**24.**

106.)  Also critical is Tpr. Johnson's erroneous, expert opinion as a dog handler, and in particular, this canine's handler, that the canine would have " jumped through the open window and indicated on the 'center console' ", but conflicting evidence found in the best evidence, i.e. video does not illustrate the canine jumping through the open window.

107.) Tpr. Johnson testified that the canine indicated on the black bag; however, there is not any evidence to corroborate this testimony.  He did not make any previous sworn statement regarding this point and the canine did not indicate upon the black bag while in the vehicle. **(See Defense Exh. E,O and Govt. Exh. No. 3)**

108.)  In addition, Tpr. Johnson has offered conflictiong testimony as to where "Marko" actually indicated, therefore based upon the aforementioned facts, the court should presumptively conclude that there is insufficient evidence to establish probable cause. ( see United States v. Christy, U.S. Dist. Lexis 21885 8th Cir.)

109.)  In contrast to the aforementioned cases, Trooper Johnson offered conflicting testimony regarding any narcotic contraband discovered upon his search; and curiously, while conducting the interior search of the van with the canine along side the highway, the canine failed to indicate to an overnight travel bag which contained $82,450.00 in U.S. currency that was alleged to have been tainted with elevated levels of cocaine. And Trooper Johnson possessed an aid/toy which was the source odor to which the canine alerted/indicated.

110.)  In this case, Trooper Johnson did not conduct the canine sniff within the limits of the Fourth Amendment nor did he adhere to the due process procedure of conducting the sniff within the confines outlined by the United States Supreme Court in the decisions rendered in Place, Edmonds, and Caballes, a violation of the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment.

111.)  The dog sniff was conducted after the traffic stop, a but-for cause casual relationship to the discovery of the firearm; the dog's sniff was on the interior of the vehicle, prompted and facilitated by the trooper, i.e an unalwful search; the canine did not alert or indicate to the presence of narcotics; and the trooper did not follow the due process procedure when deploying the dog, and the Glock model firearm must be suppressed.

**25.**

### C. UNDERLINE UNCONSTITUTIONAL STOP
**Analysis of Facts and Case law**

112.) Troopers Michael Volk and Robert Johnson of the Pennsylvania State Police
were positioned at a stationary post at the eastern portal of the Allegheny
Tunnel. Trooper Volk has only worked this area his entire sixteen year
career, and much more often than Trooper Johnson. ( **(S.H.) 4/28 Tr. pg.
18:19-24; 85:17-23; 153:14-16,25, 154:1; 156:16-25,157:1-2;
5/20 Tr. pg. 60:11-24; 129:16-24; 130:2-9 and Defense Exh. D)**

113.)   Prior to this area, there are solid double lines in the roadway to be obeyed
by motorist and a signpost that directs traffic to " Stay in Lane ",
followed by a rather large curve in the road in which the view of on
coming traffic is obscured; Tpr. Johnson's visibility of this stretch of the roadway
was one quarter mile **5/19 Tr. pg. 150:3-25, 151:1-15;** a guardrail obstructed
the view. Since this date, there has been road construction on this stretch of the
highway.   ( **(S.H.) 4/28 Tr. pg. 19:12-14; 52:6-14; 55:21-25; 77:20-25;
5/20 Tr. pg.  114:20-25,115:1-7; 140:19-25,141:1-9; 6/30 Tr. pg. 106:6-17
and Defense  Exh. FF & MM);** Tpr. Johnson testified that this area was fairly
illuminated, **(5/20 Tr. pg. 80:4-8);** however, Tpr. Volk testified to the contrary,
**(5/20 Tr. pg. 130:15-25,131:1-6)**

114.)   Tpr. Volk testified that on the date of the stop, there was an estimated
distance of one half (1/2) mile from the " stay in lane " sign to the entrance
of the tunnel. ( **(S.H.) ) 5/20 Tr. pg. 152:4-14,24-25,153:1-3.**
Tpr. Johnson estimated that the *current* distance from the entrance of the
tunnel to the " stay in lane " sign *is* two-tenths of a mile. **(S.H.) 5/20 Tr. pg.
61:19- 25,62:1-7.**  He was uncertain as to whether the solid double lines
in the roadway were before or after the " stay in lane " signs.
When addressed by the court, Tpr. Johnson stated he was unsure if this
area of the roadway had been changed;**(S.H.) 4/28 Tr. pg. 56:5-15;** however, he
offered inconsistent testimony ; **5/20 56:9-25,57:1-25,28:1-10 and Defense Exh.
A & D**
Richard Villa, investigator for the Public Defenders office, **(S.H.) 6/30 Tr. pg.
80:13-25,81:1-24,** described the roadway and his observations on the
Turnpike, **6/30 Tr. pg.  82:9-25,83:1-24 and Defense Exh. KK & LL**, and
that the distance between the " Stay in lane " sign in Defense Exh. FF was a
quarter (1/4) mile, **6/30 Tr. pg. 88:14-22; 90:2-12; 91:4-19,** and the double
solid line **6/30 Tr. pg. 93:24-25,94:1-5.**
Robert Schirf,defense private investigator, **(S.H.) 6/30 Tr. pg. 95:11-25,
96:1-25,** had the opportunity to travel the Turnpike and collected traffic data
and made roadway observations, **(S.H.) 6/30 Tr. pg. 97:1-25,98:1-8.**
He also observed westbound traffic from the stationary patrol position, **6/30
Tr. pg. 98:24-25,99:1-25,100:1-11, and Defense Exh. II & JJ**.
Mr. Schirf was not permitted to continue his investigative work for defendant,
**6/30 Tr. pg. 101:10-15.**

115.) More traffic passed by merely seconds after Sullivan stopped; However, Tpr. Johnson testified that there were no other vehicles, but the video of the stop demonstrates otherwise. Only 9 seconds elasped between the time the van pulled to a complete stop and when other vehicles passed by. It should be noted that the tunnel is a distance of 1.23 miles which would mean all vehicles were visible and in close proximity. **(S.H.) 4/28 Tr. pg. 98:17-21; 111:21-25, 112:1-25, 113:1-25; (S.H.) 6/30 Tr. pg. 105:19-25, 106:1-2 and Defense Exh. E**

116.) Tpr. Johnson testified that the left lane statute only has two exceptions when vehicles may be driven in the left lane. **(S.H.) 4/28 Tr. pg. 20:25, 21:1-4; 5/20 Tr.pg. 86:2-25;** However, 75 Pennsylvania C.S.A 3313 has five exceptions that permit vehicles to be driven in the left lane. **(S.H.) 5/20 Tr.pg. 87:23-25, 88:1-24; 89:25, 90:1-3; 91:15-25 and Defense Exh. DD**
The first exception, " Unless otherwise posted " was clearly established by both Tpr. Johnson and Tpr. Volk, when each testified that prior to the Allegheny Tunnel, where they were positioned, the van encounted a signpost that stated, "Stay in Lane", an estimated half (1/2) mile from the tunnel. **(S.H.) 4/28 Tr. pg. 20:8-16; 5/20 Tr.pg. 56:9-24; 61:19-25, 62:1-7; 91:15-25; 139:23-25, 140:1-18**
This would indicate that Tpr. Johnson was aware of the posting and still proceeded to stop a vehicle which was complying with the law by obeying the road signs and roadway markings. **(S.H.) 4/28 Tr. pg. 77:20-25; 5/20 Tr. pg. 98:8-24 and Defense Exh. EE**
Another exception which permitted the vehicle to operate in the left lane is:
" When traveling at a speed greater than traffic flow ".
The rather large curve in the road reduced Tpr. Johnson's visibility to a quarter mile and his lack of knowledge of the exceptions in the statute, these combined, prevented him from observing other vehicles which were behind defendant in near proximity, and he did not make an effort to determine the presence or absence of the other vehicles.
**(S.H.)  5/20 Tr.pg. 60:25, 61:1-8; 64:24-25, 65:1-5,13-20**
In addition, Tpr. Johnson misidentified the statute that he believed to have been violated. **(S.H.) 4/28 Tr. pg. 89:10-14; 92:16-21; 94:2-10 and Defense Exh. EE**

117.) As noted herein, the weight of the evidence established that Trooper Johnson made a traffic stop predicated upon a misunderstanding of the law.  Because the traffic stop was accomplished as a result of this constitutional violation, all of the fruits of that stop must be suppressed.

118.)  The Fourth Amendment provides that  ' [t]he right of people to be secure in their persons, houses, papers, and effects, against unresonable searches and seizures, shall not be violated.'   " When police make a traffic stop a passenger in the car, like the driver is seized for Fourth Amendment purposes and so may challenge the stop's constitutionality. "
Brendlin v. California, 127 S. Ct. 2400 (2007).

**27.**

119.) The Court went at length to discuss an unconstitutional stop in
UnitedStates v. Mosley, 454  F.3d 249 (3rd Cir. 2006),
citing Ninth and Eleventh  Circuit decisions based upon analogous facts.
United States v. Twilley, 222 F.3d 1092 (9th Cir. 2000);
United States v. Chanthasouxat,  342 F.3d 1271 (11th Cir. 2003).

120.) The officer's understanding of the Pennsylvania C.S.A. 3313(d) statute
was objectively unreasonable and a mistake of law, therefore, the traffic stop
was unconstitutional.

Based upon conflicting testimony regarding the distance of visibility and
where the " Stay in lane " sign was posted and the double solid line, it would
take a vehicle traveling at the posted speed limit of 55 mph, anywhere from more
than 15 seconds to more than 30 seconds to cover the stretch of roadway
claimed to be visible by Tpr. Johnson; It would be impossible to travel the speed
limit, be positioned somewhere before the double solid line and/or the
" stay in lane " sign, travel from that point and pass Tpr. Johnson in *3-5 seconds*.
**(S.H.) 4/28 Tr. pg. 86:3-5; 110:24-25,111:1; 5/20 63:17-25, 64:1-5; 108:5-9;
119:7-20; 130:10-14** The van would have to had been well beyond and pass the
double solid line and the " stay in lane " sign, and closer to his position when he
first observed the van. **(S.H.) 4/28 Tr. pg. 18:21-25,19:1-4; 5/20 Tr.pg. 60:22-25,
61:1-8 and Defense Exh. A,B,C,D,II and JJ**

121.) In the instant, the defendant's vehicle met two of the exceptions included in
the statute that permitted driving in the left lane in the area upon which
Trooper Johnson first encountered the vehicle; **Two exceptions** which
were *unmentioned* and *unknown* by Trooper Johnson.

122.) In United States v. Washington, 455 F.3d 824 (8th Cir. 2006), the court
stated, " .... if an officer makes a traffic stop based on a mistake of law,
the legal determination of whether probable cause or reasonable suspicion
existed for the stop is judged by whether the mistake of law was an
" objectively reasonable one ". (citation omitted)

123.) In United States v. Johnson, 63 F.3d 242 (3rd Cir. 1995), the court decided
to adopt the majority standard in applying the authorization test-  the
" could " test. Under that approach, materials seized following a traffic stop
are admissible so long as a reasonable police officer *could* have made the
stop.

124.) In United States v. Hanton, 418 F. Supp. 2d 757 2006 U.S. Dist. Lexis 7558
The traffic stop occurred at the exact same time and location as the case at
bar.  In the finding of facts, decided by this court, the trooper noticed a
vehicle in the left lane of traffic, " traveling at a speed greater than traffic
flow ". The trooper was aware of this exception for the vehicle to be in the
left lane and determined that the driver was violating the speed limit law,
rather than a left lane violation.

**28.**

125.)  In the case at bar, the irrefutable fact that there were double solid line roadway markings, a sign post that stated " Stay in Lane ", and the presence of slower moving traffic in close proximity, the statute having stated " unless otherwise posted ", and  " Traveling at a speed greater than traffic flow " as exceptions for a vehicle to lawfully operate in the left lane, and the trooper being aware of the roadway markings and the sign but lacking knowledge of the statute exceptions, coupled with the brief 3-5 seconds that he caught first sight of the vehicle until it passed him, a reasonable officer _could not_ have made the stop.

126.)  The level of clarity in the language [ of the statute ] is such that require the court to declare Trooper Johnson's beliefs and actions objectively unreasonable under the circumstances.

127.)  Accordingly, " Thus in evaluating the constitutionality of a traffic stop, a court is free to examine the sufficiency of the reasons for the stop as well as officer's credibility. ", United States v.  Johnson, 63 F.3d 242 (3rd Cir. 1995)

128.)  In United States v. Delfin-Colina, 464 F.3d 392 (3rd Cir. 2006), the Court of Appeals stated an officer's Fourth Amendment burden of production is to 1) identify the ordinance or statute he believed had been violated, and  2) provide specific articulable facts that support an objective determination of whether any officer _could_ have possessed reasonable suspicion of the alleged infraction.  As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination. **(S.H.) 6/30 Tr. pg. 62:9-25,63:1-25,64:1-7**

129.)  Bin Raymond ask this Court to consider, would have this stop been objectively reasonable had a Penn Dot employee or another officer been directing traffic to stay in lane at the same distance as the " Stay in lane " sign or roadway markings, and Tpr. Johnson and/or Tpr. Volk been aware of his or her presence ?  For that limited purpose, all would be equally, traffic control devices. **(S.H.) 4/28 Tr. pg. 93:20-25, 94:1**

130.)  Bin Raymond ask this Court to reason, if Tpr. Johnson would conceal his search of the van before the search warrant was approved, and testify contrary; deny using deceptive interdiction tactics; initially deny, intentionally exclude the first pat search of defendant from both sworn affidavits, and eventually excuse the first pat search, was there ever justification for the initial stop?

### D. <u>Government's Failure to Satisfy Burden of Proof</u>
### Analysis of Facts and Case law

In the totality of the circumstances, the court is urged to consider the following:

### " Deception Destroys and Deprives "

If not discredited, Tpr. Johnson's false testimony on material facts will destroy and challenge the fairness,integrity and public reputation of judicial proceedings.
If left unaddressed, it could set precedent forging the way to deprive the powerless of Constitutional security enjoyed at leisure by the powerful few.

131.)  Defendant now presents to the Court substantial evidence pertaining to impeachment evidence regarding the credibility of the government's sole witness.

It should be noted by the Court that Tpr. Johnson would only include or state *facts* he believe are necessary to *prosecute* a case: **(S.H. 4/28 Tr. pg. 121,122,123 vs. Tr. pg. 119:3-25)**

At question for the court is the issue of credibility regarding the government's chief and sole witness, Trooper Robert Johnson.
The summary of which as follows:

On material facts, the witness offered false testimony and conflicting evidence:

1.) Visibility on highway: Prelim. Hearing 1/4 mile; Supp. Hearing 1/4-1/2 mile
2.) " Stay in Lane " sign being 2/10 or 1/4 mile from tunnel, but conflicting evidence introduced by Tpr. Volk's testimony that sign was 1/2 mile from the tunnel.
3.) Vehicle Ownership: denial that he testified that defendant was owner and that Sworn Affidavit of Criminal Complaint ( Defense Exh. O ) characterized defendant as owner.
4.) Deceptive Drug interdiction tactics: Denial that he ever used these tactics.
5.) Pat Search: denied first pat search at Prelim. Hearing and excluded this pat search on Government Exh. No.3 and Defense Exh. O.
6.) Pat Search: Denied searching defendant's pocket with flashlight.
7.) Original Articulable Facts of Reasonable Suspicion: Prelim. Hearing- Point of Origin, Criminal Histories and Conflicting statements.
8.) Opinion regarding "Marko" jumping through the open window, but canine did not do so at open window on passenger door.
9.) Stating on direct-examination "Marko" indicated at base of center console, then changed his testimony to base of dashboard.  **4/28 Tr.pg. 33:13-14; 37:1-4; 38:8-13; 5/19 174:12-16**
10.) Stating that he discovered marijuana at the base of dashboard, but made sworn statement that he found no drugs in vehicle.
11.) Stating that the traffic stop lasted " 5-8 minutes, if that ", but video is best evidence to contradict this false statement.
12.) Stated on the search warrant affidavit that defendant told him another marijuana pipe was in the vehicle, but testified that Tpr. Volk was told this by defendant.

13.) Tpr. Volk's arrival to the traffic stop **( S.H.) 4/28 Tr. pg. 28:25, 29;1-4  vs.
Best evidence, i.e video**

14.) Stated that he discovered the large sum of money *after* execution of the search
warrant, but conflicting evidence was introduced by Tpr. Brock's testimony.

Trooper Brock testified that there was nothing unusual or different in the
present case that would have caused him to deviate from the manner in
which he executed his duties. Trooper Brock followed the proper
training procedure to record the approximate time and date of his
involvement in this incident. He proofread the report before submitting it.

Tpr. Johnson signed and submitted a false incident report in this matter,
**see pg. 5 of Def. Exh. R paragraph 5**; signed and submitted a false sworn
statement, **see Def. Exh. O paragraph 7**; and testified untruthfully,
all of which is with regard to the search being conducted prior to the
search warrant being applied for and obtained.

United States v. Randolph, 456 F.2d 132,135 ( 3rd Cir. 1972)

United States v. Gaudelli, 134 Fed. Appx 565 ( 3rd Cir. 2004 )

Perjury consist of four elements : 1) False statement  2) given under oath
3) made knowingly and willfully  4) that concerns a material matter.

In the instant case, there is sufficient evidence on record to establish that
Tpr. Johnson made false statements and committed perjury, violating 18 U.S.C.
1621 and 18 U.S.C. 1623; and the government's chief witness violated the
defendant's Fourth, Fifth and Fourteenth Amendment rights guaranteed under
the United States Constitution.

United States v. Jones, 572 F. Supp. 2d 601, the case overview states, in part:

When a prosecution begins with state law enforcement officers enforcing
state criminal codes and alleging a state crime for which they submit their
evidence of probable cause to a local magistrate in order to obtain a search
warrant, they must establish probable cause to search for evidence of that
crime in accordance with the states's constitutional procedure as applied to
the contents of the affidavit of probable cause for the search warrant.....

In the case at bar, the state's constitutional procedure was violated.
The search warrant must be applied for and obtained *before* the search can
be executed.

132.) Trooper Johnson offered misleading, often false, and at moments, perjurious
testimony which defendant would asked the court to consider regarding
Trooper Johnson's credibility.

**(S.H.) 4/28 Tr. pg. 26:20-24; 60:14-24; 71:8-15**

**31.**

**(S.H.) 4/28 Tr. pg. 27:3-18; 5/19 Tr. pg. 27:21-25, 28:1-9; 34,35, 36:1-22**

**(S.H.) 4/28 Tr. pg. 41:12-25, 42:1-25, 43:1-25, 44:1-2,13-25, 45:1-13;119:8-25;**

**(S.H.) 8/17 Tr. pg. 28:13-25, 29:1-3**

**(S.H.) 5/19 Tr. pg. 47:21-25, 48:1-16; 89:15-25; 90:3-14,24-25, 91:1-7**

**(S.H.) 4/28 Tr. pg. 184:12-21**

**(S.H.) 5/19 Tr. pg. 86:10-25, 87:1-2,9-25, 88:1-25, 89:1-7**

**(S.H.) 5/19 Tr. pg. 72:9-25, 73:1-25, 74:1-3; 78:22-25, 79:1-25, 80:1-6;**
**85:1-25, 86:1-9**

**(S.H.) 5/19 Tr. pg. 76:20-25, 77:1,24-25, 78:1-6; 97:10-23**

**(S.H.) 5/19 Tr. pg. 131:10-25, 132:1-22; 133:1-25, 134:1-13**

**(S.H.) 4/28 Tr. pg. 59:19-20**

**(S.H.) 5/19 Tr. pg. 140:6-25, 141:1-22; 142:11-25, 143:1-21; 151:16-25,**
**152:1-25, 153:1-17**

**(S.H.) 5/19 Tr. pg. 146:8-25, 147:1-2; 149:4-12; 150:3-25, 151:1-12**

**(S.H.) 6/30 Tr. pg. 46:2-4; 47:10-25,48:1-5,10-17; 64:23-25,65;1-25,**
**66:1-2 and Defense Exh. E, O, P, Q, & R and**
**Govt. Exh. No. 3**

United States v. Gricco, 277 F 3d. 339 (3rd Cir. 2001);
United States v.  Murphy, 402 F. Supp. 2d 561;
United States v. Brothers, 75 F.3d  845,853 (3rd Cir. 1996);
United States v. Walker, 155 F.3d 180 (3rd Cir. 1998);
United States v. McNeill, 285 Fed Appx. 975 (3rd Cir. 2007)

False statements implicating a witness's credibility are material....
materiality considers whether.... the false statement was capable of influencing
the tribunal on the issue before it.
Therefore, the false statement might be material when calculated and intended
to prop and bolster the testimony of the witness on some material point by
clothing it with circumstances which strenghten the credibility of the witness.

A false statement is material... if the statement has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making a particular determination. The materiality is construed broadly.
Accordingly, the statements need not be material to any particular issue, but may be material to collateral matters that might influence the court... in its decision.

133.)  Without credible evidence, the government has not met the required burden of proof, thus lacking the requisite probable cause, and Mr. Bin Raymond's rights under the Fourth and Fourteenth Amendment were violated.

WHEREFORE, the Defendant prays that this Court grant relief for the foregoing reasons.

/s/ Shahiydullah A. Bin Raymond