## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL No. 3:2007-32 |
| RAYMOND WALKER, a/k/a | ) | |
| Shahiydullah A. Bin Raymond, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Shahiydullah A. Bin Raymond's Motion to Suppress Evidence (Doc. No. 45). The Government filed a Response (Doc. No. 55). The Court held a six-day[1] Suppression Hearing on Defendant's motion. Following the Suppression Hearing, Defendant ("Bin Raymond") filed Proposed Findings of Fact and Conclusions of Law (Doc. No. 202) ("Def.'s Br."). The Government filed a Post-Hearing Brief (Doc. No. 216) ("Gov. Br."). Bin Raymond thereafter filed Additional Proposed Findings of Fact and Conclusions of Law (Doc. No. 218) ("Reply"). In this Memorandum the Court makes its own findings of fact and conclusions of law.

## I. FACTUAL BACKGROUND

The following facts are taken from the Suppression Hearing transcript and exhibits, including the video footage of the stop itself. In the early morning hours of Monday, May 21, 2007, Bin

---

[1] The Suppression Hearing took place over the following days:
April 28, 2009
May 19, 2009
May 20, 2009
June 30, 2009
August 17, 2009
November 24, 2009
This Court heard approximately 26 hours of testimony that generated almost one thousand pages of transcript.

Raymond[2] was a passenger in a vehicle traveling westbound along the Pennsylvania Turnpike approaching the Allegheny Tunnel. Bin Raymond's cousin Frank Sullivan ("Sullivan") was driving the vehicle.

Trooper Robert F. Johnson ("Trooper Johnson") of the Pennsylvania State Police was working a shift from midnight to 8:00 a.m. on Monday, May 21, 2007. (Apr. 28, 2009, Tr. 18:4-9.) He was engaging in highway interdiction on the Pennsylvania Turnpike around the Allegheny Tunnel in Somerset County. (Apr. 28, 2009, Tr. 18:8-15.) Trooper Michael Volk[3] was also engaging in highway interdiction nearby along the Turnpike. (May 20, 2009, Tr. 124:14-16.) Trooper Johnson testified that he positioned himself no more than fifty yards from the opening of the Allegheny Tunnel. (Apr. 28, 2009, Tr. 19:9-11.) From this position, at approximately 2:00 a.m., Trooper Johnson observed a vehicle traveling westbound toward the tunnel in the left lane in violation of Pennsylvania's "right lane" rule. (Apr. 28, 2009, Tr. 18:23-19:1.) Trooper Johnson entered the tunnel behind the vehicle and stopped the vehicle on the other side of the tunnel. (Apr. 28, 2009, Tr. 21:17-18.)

While following the vehicle in the tunnel, Trooper Johnson conducted a registration check of the vehicle's license plate number. (Apr. 28, 2009, Tr. 21:25-22:2.) The vehicle was a silver-

---

[2] Bin Raymond is representing himself *pro se* and is assisted by standby counsel. Considering he is neither an attorney nor a law enforcement officer, Bin Raymond demonstrated remarkable legal acuity throughout these proceedings. Bin Raymond prepared most of the motions in this matter himself, including the Motion to Suppress, the Post-Hearing Proposed Findings of Fact and Conclusions of Law, as well as the Additional Proposed Findings of Fact and Conclusions of Law. Bin Raymond also conducted most of defense questioning during the Suppression Hearing. In quoted excerpts from the Suppression Hearing, when the witness appears to address defense counsel directly, the witness is in fact addressing Bin Raymond. During questioning Bin Raymond sometimes referred to himself in the third person.

[3] The Government did not call Trooper Volk to testify, but the Court permitted Bin Raymond to call Trooper Volk as if on cross-examination. (May 20, 2009, 134:19-135:15.)

colored minivan with Ohio plates registered to a Mary Taylor. (Apr. 28, 2009, Tr. 22:11-12; Def. Ex. F.)

Trooper Johnson left his patrol vehicle and approached the driver's side of the van. Sullivan was in the driver's seat, and Bin Raymond was in the first row of seats behind the driver's seat. (Apr. 28, 2009, Tr. 22:21-23; 23:12-14.) Trooper Johnson explained why he had pulled the van over, collected Sullivan's license and insurance information, and returned to his patrol vehicle. (Apr. 28, 2009, Tr. 22:23-23:7.) Trooper Johnson checked Sullivan's license and criminal history. (Apr. 28, 2009, Tr. 23:20-22.) That check revealed that Sullivan's license was under suspension in Ohio and had a criminal history involving weapons and illicit drugs. (Apr. 28, 2009, Tr. 24:1-3.) Trooper Johnson returned to the van, informed Sullivan that he was not a valid driver, and collected Bin Raymond's license. (Apr. 28, 2009, Tr. 24:8-22.) Trooper Johnson then checked Bin Raymond's license and criminal history. (Apr. 28, 2009, Tr. 24:24-25:1.) Bin Raymond's license was valid, but he had a criminal history involving bank robbery and weapons violations. (Apr. 28, 2009, Tr. 25:3-5.)

Trooper Johnson prepared a written warning, walked back to the van, and returned Bin Raymond's license. (Apr. 28, 2009, Tr. 25:23-24; 26:14-15.) He then asked Sullivan to exit the vehicle, which Sullivan did without objection. (Apr. 28, 2009, Tr. 25:23-26:1.) Trooper Johnson explained the warning to him, handed him his license and insurance, shook his hand, and bid him good evening. (Apr. 28, 2009, Tr. 26:16-19.)

As Sullivan began to walk away from Trooper Johnson, Trooper Johnson asked Sullivan if he would not mind answering another question or two. (Video, Def. Ex. E.) In response to Trooper Johnson's questions, Sullivan told Trooper Johnson that he and Bin Raymond had been in Baltimore

for the day and were headed back to Ohio. (Def. Ex. E.) Trooper Volk, serving as backup officer, arrived on the scene at some point during Trooper Johnson's questioning of Sullivan. (Def. Ex. E.) Trooper Johnson left Sullivan with Trooper Volk and walked back to the van to question Bin Raymond. (Def. Ex. E.) The questioning of Bin Raymond quickly became verbally confrontational. (Def. Ex. E.) Trooper Johnson ordered Bin Raymond out of the vehicle, patted him down, and brought him over to stand by Sullivan. (Def. Ex. E.)

Trooper Johnson then conducted a canine sniff of the vehicle. At the time of the stop, Trooper Johnson was working as a canine handler with the Bureau of Emergency and Special Operations. (Apr. 28, 2009, Tr. 11:7-9.) As of May 2007, Trooper Johnson had worked as a canine handler for eleven years and specifically with Marko, the dog involved in the stop, for four years. (Apr. 28, 2009, Tr. 12:6-7.) During the canine sniff, Marko entered the van through the open driver door and alerted at the base of the center console. (Apr. 28, 2009, Tr. 33:13-14.) He then alerted at the right front passenger door. (Apr. 28, 2009, Tr. 33:16-17.)

Following the positive canine alert, Troopers Johnson and Volk took Bin Raymond and Sullivan back to the Somerset Turnpike Barracks. (Apr. 28, 2009, Tr. 8-14.) Trooper Johnson then requested a search warrant, which was shortly thereafter signed and executed. (Apr. 28, 2009, Tr. 43:7-25.) The search of the vehicle revealed a black bag containing over $80,000 in cash that subsequently tested positively for cocaine. (Apr. 28, 2009, Tr. 45:5-17.) A search of the center console revealed a Glock model 27 semiautomatic pistol. (Apr. 28, 2009, Tr. 48:10-11.) On November 14, 2007, a federal grand jury returned an indictment against Bin Raymond for unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. 922(g)(1).

Since Bin Raymond objects to every phase of Trooper Johnson's encounter with Bin

4

Raymond and Sullivan, the Court will work sequentially through each step of the traffic stop and the detention following the traffic stop, addressing each of Bin Raymond's arguments in turn.

## II.     LEGAL STANDARD

Evidence obtained from an illegal seizure is subject to suppression under the fruit of the poisonous tree doctrine. *Wong Sun v. United States*, 371 U.S. 471 (1963). In this case, the Court examines a traffic stop and a subsequent detention as two separate events. "If the initial traffic stop is illegal, then even if the passenger is allowed to leave the scene before the search, it will not be the case that the police have not violated his Fourth Amendment rights." *United States v. Mosley*, 454 F.3d 249, 256 (3d Cir. 2006). Once it is found that the initial traffic stop is lawful, the Court must look to whether the traffic stop somehow evolved into an unlawful seizure by lasting unreasonably longer than the time needed to complete the traffic stop. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."). If an encounter with law enforcement occurring after completion of the traffic stop is consensual, the protections of the Fourth Amendment are not triggered. *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001). A brief detention following a consensual encounter may be reasonable under the Fourth Amendment provided it is supported by articulable, reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

## III.    DISCUSSION

The Court concludes that two lawful detentions took place on May 21, 2007. The first was a traffic stop for violation of Pennsylvania's "right lane" rule. Once Trooper Johnson completed the traffic stop, there was an intervening period of time where the Fourth Amendment was not

implicated at all. During this period of time Trooper Johnson engaged in consensual encounters with Sullivan and then Bin Raymond. It was during his conversation with Bin Raymond that Trooper Johnson seized Bin Raymond within the meaning of the Fourth Amendment. The second detention was simply a *Terry* stop justified by Trooper Johnson's reasonable suspicion that criminal activity was afoot.

## A. TROOPER JOHNSON

As a preliminary matter, because this memorandum is replete with references to Trooper Johnson's testimony, and Bin Raymond accuses Trooper Johnson of perjuring himself (Def.'s Br. 30-33), the Court first turns to Trooper Johnson's credibility. Trooper Johnson's demeanor, both on the Pennsylvania Turnpike and in the courtroom, were professional. He did not hesitate to admit when he had made a mistake, for example, that his turning off the vehicle was inconsistent with not taking control of the vehicle. (May 20, 2009, Tr. 75:4-7 (stating that turning off the vehicle "was an oversight on my part").) Having previously testified that he had not looked inside Bin Raymond's pockets during his initial pat-down of Bin Raymond, upon watching the video (Def.'s Ex. E) Trooper Johnson later readily agreed that he had in fact looked inside Bin Raymond's pocket with a flashlight. (Nov. 24, 2009, Tr. 39:15-18 (explaining that "if the Court would throw the [pocket contents][4] out, that's fine. But my goal is to always go home at the end of the night. So if looking into your pocket is what you're referring to, then yes, I did that.").) Bin Raymond's theory that Trooper Johnson engaged in deceptive police tactics the night of the stop and contradicted himself

---

[4] It is not clear what the contents of that pocket were. Though a marijuana pipe was later found on Bin Raymond's person, the Court is unable to tell from the video if it came from the same pocket Trooper Johnson looked inside. Bin Raymond tells the Court that during the flashlight pocket search, Trooper Johnson "made no discovery of any item that would justify his stated intention to search and deploy the canine." (Def.'s Br. 23.)

on the stand is baseless. The Court found Trooper Johnson to be an extremely credible witness.

## B. TRAFFIC STOP

Around 2:00 a.m. on Monday, May 21, 2007, Trooper Johnson pulled over the vehicle in which Bin Raymond was a passenger for violation of 75 P.S. 3313(d) of the Pennsylvania Motor Vehicle Code. That code section, which imposes on drivers a general requirement to remain in the right lane except under certain circumstances, provides as follows:

> (1)    Except as provided in paragraph (2) and unless otherwise posted, upon all limited access highways having two of more lanes for traffic moving in the same direction, all vehicles shall be driven in the right-hand lanes when available for traffic except when any of the following conditions exist:
>
>     (i)    When overtaking and passing another vehicle proceeding in the same direction.
>
>     (ii)    When traveling at a speed greater than the traffic flow.
>
>     (iii)    When moving left to allow traffic to merge.
>
>     (iv)    When preparing for a left turn at an intersection, exit or into a private road or driveway when such left turn is legally permitted.
>
> (2)    Unless otherwise posted, no vehicle or combination over 10,000 pounds may be driven in the left-hand lane of a limited access highway having three or more lanes for traffic moving in the same direction except when preparing for a left turn at an intersection, an exit or into a private road or driveway when such left turn is legally permitted.

Trooper Johnson testified that he observed Bin Raymond's vehicle in the "wrong" lane for three to five seconds as it approached the Allegheny Tunnel. (Apr. 28, 2009, Tr. 21:5-8.) Bin Raymond argues that Trooper Johnson's stop of the vehicle was unsupported by reasonable suspicion or probable cause. The Court credits Trooper Johnson's testimony and disagrees with Bin Raymond.

Bin Raymond argues that his vehicle should never have been pulled over in the first place. A traffic stop is a "seizure" under the Fourth Amendment "even though the purpose of the stop is

7

limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979).

Everyone in the vehicle, not just the driver, is seized. *Id.* Thus, Bin Raymond, a passenger in the

vehicle (and also, incidentally, the owner), has standing to assert a Fourth Amendment violation.

"[E]xcept in those situations in which there is at least articulable and reasonable suspicion . . . that

either the vehicle or an occupant is . . . subject to seizure for violation of law, stopping an automobile

and detaining the driver in order to check his driver's license and the registration of the automobile

are unreasonable under the Fourth Amendment." *Id.* Since the Court finds that Trooper Johnson

had probable cause to believe the driver of the van was committing a violation of the Pennsylvania

Motor Vehicle Code, the traffic stop was reasonable and did not violate the Fourth Amendment.

"[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely

pretext for an investigation of some other crime." *Mosley*, 454 F.3d at 252. It is of no import how

severe a traffic violation is; even a minor traffic violation, if there exists probable cause to believe

one has occurred, legitimizes a traffic stop. *See Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)

(finding a traffic stop proper because the defendant was violating the Pennsylvania Motor Vehicle

Code by driving with expired tags); *United States v. Hutchinson*, 471 F.Supp.2d 497, 501 (M.D. Pa.

2007) (finding probable cause existed that defendant had violated the California Motor Vehicle

Code[5]).

At a certain distance from the Allegheny Tunnel, the two lanes of traffic are demarcated by

white hash lines that permit passing. (Apr. 28, 2009, Tr. 20:11-12.) Closer to the tunnel, double

---

[5] Although the traffic violation in *Hutchinson* took place in California, the case unfolded in Pennsylvania. After the defendant was taken into custody in California, a grand jury in the Middle District of Pennsylvania returned an indictment against him for violation of 18 U.S.C. § 846. *Hutchinson*, 471 F.Supp.2d at 498. The defendant was transferred to the Middle District of Pennsylvania following a Rule 40 hearing in California. *Id.*

white lines divide the two lanes, at which point no passing is permitted. (Apr. 28, 2009, Tr. 20:12-16.) Presumably, the prohibition on passing before cars enter the tunnel prepares drivers for the requirement that they stay in their lane once they are in the tunnel. As drivers approach the tunnel they pass "STAY IN LANE" signs, and just as they enter the tunnel drivers pass underneath the words "DO NOT CROSS CENTER LINE." (Def.'s Exs. A-D, FF.)

Trooper Johnson testified that he observed the vehicle when it was in the white hash mark area and watched it remain in the left lane for three to five seconds before reaching the "stay in lane" zone. (Apr. 28, 2009, Tr. 20:17-21; 21:7-8.) He further testified that the vehicle was alone on the road, with no other traffic surrounding it. (Apr. 28, 2009, Tr. 20:22-23, 21:11-15.) Finally, Trooper Johnson noted that the Pennsylvania Turnpike being a limited access highway, no left-hand turn would have been possible. (Apr. 28, 2009, Tr. 21:2-4.) Accordingly, none of the exceptions of 75 P.S. 3313(d)(1) existed at the time of the traffic stop. The Court credits Trooper Johnson's testimony as to the traffic violation. Because Trooper Johnson had probable cause to believe a traffic violation had occurred, the traffic stop was lawful. *See United States v. Whren*, 517 U.S. 806, 810 (1996) (observing that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"). Bin Raymond's argument that Trooper Johnson did not have probable cause to pull the vehicle over is without merit. The van was legally stopped.

Bin Raymond would like to view the purpose of a traffic stop more narrowly than courts do. "[O]nce a car has been legally stopped, the police may 'escalate' the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants." *Mosley*, 454 F.3d at 252. Trooper Johnson's conduct did not exceed the reasonable bounds of a traffic stop. The

initial seizure of Bin Raymond and Sullivan lasted no longer than the time needed to conduct the traffic stop and issue the written warning. This is decidedly not the situation where a lawful traffic stop evolved into an infringement of Fourth Amendment rights through an unreasonable prolongation. *See Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005) (where a canine sniff did not unreasonably prolong a lawful traffic stop beyond the time required to complete the written warning).

## C.    SULLIVAN QUESTIONING

Trooper Johnson announced the completion of the traffic stop when he told Sullivan, "Have a good evening, buddy. Take care." (Def. Ex. E.) Trooper Johnson then asked Sullivan if he minded answering "another question or two real quick." (Def. Ex. E.) Sullivan replied, "Sure." (Def. Ex. E.) It is difficult to overstate the degree to which Bin Raymond finds Trooper Johnson's conduct to be laced with deceit. He believes that in asking these questions Trooper Johnson was engaging in "deceptive interdiction tactics." (Def.'s Br. ¶ 23.) The Court finds Bin Raymond's arguments on this point to evince a fundamental misunderstanding about whether a seizure occurred and to be otherwise meritless for several reasons. The Government, on the other hand, seems to view the further questioning of Sullivan and Bin Raymond as an extension of the traffic stop justified by reasonable suspicion that arose during the course of the traffic stop. This, too, is an incorrect representation of the sequence of events. If the further questioning were an extension of the traffic stop, then this Court's inquiry would be whether "something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). However, as discussed below, the Court does not view the further questioning as an investigative detention deriving from the scope of the original traffic stop.

10

The questioning of Sullivan fell within the following sequence of events. First, there was a traffic stop. The traffic stop ended when Trooper Johnson said goodbye to Sullivan. Then there was a consensual encounter between Trooper Johnson and Sullivan during which exchange Trooper Johnson asked Sullivan questions unrelated to the traffic stop. Then Trooper Johnson engaged Bin Raymond in questioning. Then Bin Raymond and Sullivan were detained. There were, in essence, two seizures: a traffic stop, then a *Terry*-type stop, with an intervening period of time during which Trooper Johnson's conduct implicated no constitutional rights.

### 1.   **Consensual encounter following traffic stop**

Sullivan was not "seized" for purposes of the Fourth Amendment when Trooper Johnson asked Sullivan to answer more questions. The traffic stop had clearly ended, and Bin Raymond himself elicited testimony on this point throughout the Suppression Hearing. Several times Trooper Johnson testified that he had completed the traffic stop upon shaking Sullivan's hand and wishing him a good evening:

> Tpr. Johnson:   I had addressed the reason for the stop and completed the stop . . . .
> (Apr. 28, 2009, Tr. 179:20-21.)

> Tpr. Johnson:   I ended the stop, and then I asked Mr. Sullivan if I could ask him some additional questions.
> (Apr. 28, 2009, Tr. 182: 18-20.)

> Bin Raymond:   [Trooper Johnson's question about the vehicle occupants' relationship] was during the stop, correct?
> Tpr. Johnson:   No. That was after. After. It's after I gave Mr. Sullivan's things back and told him he was good to go, and I engaged him again.
> (Apr. 28, 2009, Tr. 183:21-24.)

11

Bin Raymond believes the further questioning of Sullivan prolonged the traffic stop.[6] It did not. The traffic stop was completed when Trooper Johnson said goodbye to Sullivan. Trooper Johnson's engaging Sullivan further did not trigger the Fourth Amendment because Sullivan consented to answering more questions. *See Florida v. Royer*, 460 U.S. 491, 497 (observing that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions"); *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (observing that "seizure does not occur simply because a police officer approaches an individual and asks a few questions"); *Jones*, 269 F.3d at 925 (finding that "[e]ven if Trooper DeWitt had no suspicion that Jones was engaged in criminal activity, if the encounter after the completion of the traffic stop was consensual, then the Fourth Amendment would not prohibit Trooper DeWitt from asking questions unrelated to the traffic stop"). Indeed, Sullivan could have declined to answer Trooper Johnson's questions. He need not even have been informed explicitly that he was free to go.[7] *Ohio v. Robinette*, 519 U.S. 33, 35 (1996) (holding that a lawfully seized individual need not be informed that he or she is free to go for a consent to search to be recognized as voluntary).

Bin Raymond's confusion as to whether he was detained is obvious from the questions he posed at the Suppression Hearing. Bin Raymond thought he was being detained without reasonable

---

[6] The Government also describes the questioning of Sullivan as a further detention, though the Government's position is that the prolongation was supported by a reasonable suspicion. (Gov. Br. 17-21.)

[7] During the Suppression Hearing, Bin Raymond asked Trooper Johnson, "[D]uring the stop you told Sullivan that he was free to leave, correct?" to which Trooper Johnson replied, "That is correct." (Apr. 28, 2009, Tr. 167:14-17.) In fact, Trooper Johnson did not tell Sullivan he was free to leave in such explicit terms, but he had no legal obligation to do so.

suspicion when Trooper Johnson reinitiated his encounter with Sullivan:

> Bin Raymond: [P]rior to walking towards the van and just talking to Mr. Sullivan, that time period, did you make any other observations that would have led you to determine that criminal activity was afoot?

(May 19, 2009, Tr. 42:1-4.) It is apparent from Bin Raymond's questions, in which he tried over and over to pinpoint the indicators that led Trooper Johnson to further question Sullivan, that he believes Trooper Johnson needed reasonable suspicion in order to engage in a consensual encounter with Sullivan. Although at the Suppression Hearing the Assistant United States Attorney asked Trooper Johnson to explain his motivation for further questioning Sullivan (Apr. 28, 2009, Tr. 27:3-18), Trooper Johnson's thoughts at that moment are legally irrelevant. Trooper Johnson asked Sullivan if he would answer questions, and Sullivan consented. This further questioning did not implicate the Fourth Amendment. *See United States v. Wilson*, 413 F.3d 382, 388 n.6 (3d Cir. 2005) (explaining that since the officer's further questioning of defendant was consensual, the court did not need to address defendant's argument that the further questioning was not justified by a reasonable suspicion of criminal activity).

One of the reasons, if not the only reason, Trooper Johnson strikes Bin Raymond as deceptive is that he asked for Sullivan's consent to answer "another question or two." (Def. Ex. E at 18:13.) Bin Raymond counts a total of 22 questions asked of Sullivan. (Def.'s Br. ¶ 23.) Bin Raymond seems to believe that, in engaging Sullivan in further questioning, Trooper Johnson entered into a sort of oral contract that he immediately breached upon asking question number three. The Court finds no basis for finding that a difference between the proposed number of questions and the actual questions asked is a mark of deception. Nor does the Court find that 22 questions of Sullivan (or

the 26 questions asked of Bin Raymond) amount to a coercive interrogation, particularly since Sullivan's evasive answers naturally generated follow-up questions. Bin Raymond's attempt to establish deceptive interdiction tactics is completely unavailing.

In fact, the only individual who appears deceptive in the Trooper Johnson–Sullivan exchange is Sullivan himself, and Sullivan appears largely responsible for the number of questions asked. Sullivan's uncertainty as to very recent events[8] in his life was readily apparent from his consensual exchange with Trooper Johnson and only prompted more questions. Sullivan said he stayed in a hotel[9], could not remember the name of the hotel but thought it might have been a Best Western, and could not remember the names of the friends with whom they met but thought one of them was nicknamed "Mickey" or "Monkey." (Def. Ex. E.) He also told Trooper Johnson that one of the purposes of the trip was to buy a car, but they had obviously not purchased a car in Baltimore. (Def. Ex. E.) It takes several questions before Sullivan finally decides he and Bin Raymond arrived in Baltimore at 10:00 a.m. on Sunday morning, a mere fifteen hours before the conversation Sullivan was having with Trooper Johnson:

> Tpr. Johnson: How long do you think you guys were down in Baltimore?
> Sullivan:     Um...
> Tpr. Johnson: Total?
> Sullivan:     Almost...let's see...well, we left last night...
> Tpr. Johnson: You said you got there this morning. What time did you get there this morning?
> Sullivan:     It was early in the morning. It was before afternoon.
> Tpr. Johnson: Before afternoon?

---

[8] The van was pulled over around 2:00 a.m. on Monday morning, and Sullivan was asked what he had been doing Sunday, May 20, 2007.

[9] The very fact that a visit to Baltimore that did not last overnight coincided with a hotel stay is in and of itself strange.

14

<pre>
Sullivan:        Yeah.
Tpr. Johnson:    Like 9 in the morning? 10 in the morning?
Sullivan:        Around 10. I believe it was around 10.
</pre>

(Def. Ex. E.) Sullivan told Trooper Johnson a highly dubious story. The story also included an indicator that, among others, contributed to reasonable suspicion, namely, the long trip with a relatively short[10] turn-around:

> Tpr. Johnson:    Mr. Sullivan informed me that they [Sullivan and Bin Raymond] got there [Baltimore] at ten in the morning [on Sunday] and left around midnight . . . . That statement there to me is a very good indicator that they traveled an extensive distance from where they originated to to [sic] Baltimore, and then are turning around very quickly and going back.

(Apr. 28, 2009, Tr. 28:4-9.) His demeanor raised suspicion as well. Trooper Volk's report indicated that Sullivan appeared to be "nervous." (Def. Ex. GG.)

Bin Raymond's outrage at the stop and subsequent detention is compounded by his discovery after the fact that Trooper Johnson had asked Trooper Volk to prepare a "consent to search" form. Trooper Johnson's intent to search the car before questioning Bin Raymond and Sullivan is legally irrelevant. Trooper Johnson's mindset has no impact on the Court's Fourth Amendment analysis. Regardless of whether Trooper Johnson was predisposed to executing a search, he could not detain Bin Raymond and Sullivan before he had a reasonable suspicion that criminal activity was afoot, and he could not search inside the van (absent consent) before he had found probable cause. Bin Raymond also cites no authority for the proposition that preparing a "consent to search" form somehow violates the Fourth Amendment. *See Mosley*, 454 F.3d at 252 (explaining that as long as

---

[10] The journey to Baltimore took fifteen hours round-trip, and if Sullivan was truthful about the arrival time in Baltimore, Sullivan and Bin Raymond spent less time in Baltimore than they spent on the road driving from Ohio to Maryland and back.

a traffic stop is lawful it can be pretext for investigating some other crime).

## D.    BIN RAYMOND QUESTIONING

Trooper Johnson was only able to ask Bin Raymond a few questions before Bin Raymond began replying with, "Why are you asking me these questions?" The answers Bin Raymond did provide as to what he had been doing in Baltimore generated contradictions with Sullivan's hazy version of events. Bin Raymond is difficult to hear on the video, but he did not identify the hotel as the Best Western. He was equally fuzzy on details and at times sought to change the subject entirely by, for example, pointing out that Sullivan was named after his grandfather. When Trooper Johnson asked for Bin Raymond's consent to search the vehicle, he declined.

Bin Raymond finds neither himself nor Sullivan to have been suspicious. That might simply be a matter of Bin Raymond's faulty self-perception combined with his apparent disbelief that something that is not a physical object can contribute to reasonable suspicion. Trooper Johnson testified that the trip itself – a 7-hour, 429-mile trip – from Ohio to Baltimore and back to Ohio within a relatively short period of time was "a very good indicator" (Apr. 28, 2009, Tr. 28:6-9) and "really piqued [his] interest" (Apr. 28, 2009, Tr. 31:2-5). The questioning of Sullivan and Bin Raymond yielded a highly suspicious story rife with contradictions. Indeed, once Trooper Johnson had both Bin Raymond and Sullivan together, he told them, "Your story doesn't match up with his story."

## E.    SEIZURE

The Court now turns to determining when Bin Raymond and Sullivan were seized. The Fourth Amendment is not triggered until seizure occurs. *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (citing *Terry*, 392 U.S. at 16). An individual may be seized when a law enforcement

16

officer uses physical force or restraint or when the individual submits to the officer's "show of authority." *Brown*, 448 F.3d at 245 (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). Here, Trooper Johnson switched to an authoritative tone with Bin Raymond, ordered him out of the vehicle, and told him to turn around and place his hands on the roof of the van. Trooper Johnson then patted him down.[11] The Court finds that a reasonable person would have found his physical movement was being restricted at this point during the encounter. Right after, Trooper Johnson verbally conveyed to Sullivan and Bin Raymond that they were being detained, and they both submitted to his authority. Specifically, after Bin Raymond exited the vehicle and was patted down, Trooper Johnson said, "I'm detaining you." (Def. Ex. E.) That unequivocally indicated seizure of both individuals, but to be absolutely precise Bin Raymond was seized first moments earlier.

There is an abundance of confusion in this case as to when seizure occurred. The Government appears to take the position that there was one continuous seizure from the moment Trooper Johnson pulled the van over with evolving legal justifications dependent on the changing circumstances. (Gov. Br. 17-21.) In his affidavit of probable cause, Trooper Johnson states that he placed Bin Raymond and Sullivan in investigatory detention following the exterior canine sniff of the vehicle. (Gov. Ex. 3.) At the Suppression Hearing, Trooper Johnson confirmed that he understood the investigatory detention to follow the canine sniff:

> Tpr. Johnson:    You were detained after the dog indicated upon the vehicle, and we then took you into

---

[11] Sullivan's pat-down was dramatically different from Bin Raymond's pat-down. Sullivan told Trooper Johnson that he had been arrested in 2004 for a concealed weapons offense. (Def. Ex. E.) In response to that, Trooper Johnson then asked Sullivan, "Mind if I pat you down real quick?" explaining, "I don't want to get shot 'n shit, you know what I mean?" (Def. Ex. E.) The Court is unable to identify the pat-down of Sullivan as the moment of seizure because Sullivan verbally and physically consented to the pat-down, and the pat-down seemed to fit naturally with the flow of the conversation. (Def. Ex. E.) Furthermore, Trooper Johnson's demeanor with Sullivan was not forceful like it was with Bin Raymond.

|               | custody. That is investigatory detention at that |
|---------------|--------------------------------------------------|
|               | point. So that is after the canine search. |
| Bin Raymond:  | So we weren't in investigatory detention at the time you did your canine search? |
| Tpr. Johnson: | No . . . . As I understood, investigatory detention is when I've got something here, I'm going and furthering, either by a search warrant or whatever, to get those things . . . . Had there been no indication [from the canine sniff] and you were permitted to go on, then you would be merely detained. There's a difference. |

(May 19, 2009, Tr. 100:12 - 101:4.) Bin Raymond obviously picked up on an anomaly here. The Court is not aware of the difference between "mere detention" and "investigatory detention." When Trooper Johnson conducted his canine search, Bin Raymond and Sullivan were detained. However, the Court's disagreement with both Trooper Johnson and the Government as to when seizure occurred does not impact the suppression decision.

Having established the moment of seizure (i.e. before the canine sniff), the Court looks to whether the seizure fell within the *Terry* exception to the warrant requirement. If it did, then the search did not violate the Fourth Amendment. In order to lawfully detain Bin Raymond and Sullivan for a brief period of time, Trooper Johnson must have had a reasonable, articulable suspicion that some criminal activity may have been afoot. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Reasonable suspicion is a "somewhat abstract" idea. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). It is an 'elusive concept,' but it unequivocally demands that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Brown*, 448 F.3d at 246 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The detention must be based on more than a "hunch." *Johnson v. Campbell*, 332 F.3d 199, 206 (3d

Cir. 2003). However, "the likelihood of criminal activity need not rise to the level required for probable cause." *Arvizu*, 534 U.S. at 273.

While the Fourth Amendment demands that detaining officers have a particularized, objective basis for suspicion, officers must also be permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *Arvizu*, 534 U.S. at 273. In addition, officers should be permitted to make "commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000). The question here is "whether a reasonable, trained officer standing in [Trooper Johnson's] shoes could articulate reasons justifying" the detention of Bin Raymond and Sullivan. *Johnson*, 332 F.3d at 206.

In reviewing Trooper Johnson's determination of reasonable suspicion, this Court looks to the "totality of the circumstances" surrounding his detention of Bin Raymond and Sullivan. *Arvizu*, 534 U.S. at 273. Each of an officer's observations may be "by itself readily susceptible to an innocent explanation" yet as a whole amount to a reasonable suspicion. *Id.* at 274. Any factor taken "by itself" may not be "proof of any illegal conduct and [be] quite consistent with innocent travel" yet still have a cumulative effect of establishing reasonable suspicion. *Sokolow*, 490 U.S. at 9.

The holistic approach to Trooper Johnson's observations is a concept that appears to elude Bin Raymond. Bin Raymond has parsed Trooper Johnson's observations in a way that is directly inconsistent with the Supreme Court's "totality of the circumstances" review. Trooper Johnson testified that prior to the canine search the following facts indicated to him that criminal activity was afoot:

> Tpr. Johnson: I had the time of day I was conducting the traffic stop,

19

the point of origin to the point of destination, which was Baltimore to Ohio, which is roughly a 439 miles, seven-hour trip, a very short stay in Baltimore, criminal histories for both occupants in the vehicle, an owner not being present, multiple conflicting stories about why they were in Baltimore, and then the fact that your story didn't match up with any of Mr. Sullivan's.

(May 19, 2009, Tr. 27:25 - 28:7.) The Court finds that Trooper Johnson did have reasonable suspicion upon those facts alone to detain Bin Raymond and Sullivan. Bin Raymond's attempts to cloud the issue by combing through the record for omissions and contradictions and "gotcha" moments[12] are unavailing. He has not grasped the concept of "reasonable suspicion," a notion that cannot be reduced to a list and then evaporated simply because each of the factors listed may in isolation be consistent with innocent conduct.

Bin Raymond finds it significant that the testimony quoted in the immediately preceding paragraph does not match exactly the indicators Trooper Johnson listed in his affidavit of probable cause (Gov. Ex. 3) or his criminal complaint (Def. Ex. O) or his testimony at the preliminary hearing (not in the record). This strikes the Court as totally unremarkable. First, Trooper Johnson explained at the Suppression Hearing that the factors he listed in his testimony were "the gist of it" (May 19, 2009, Tr. 28:9), not a comprehensive itemization. Second, as the Court has already explained,

---

[12] Frequently during cross-examination Bin Raymond would press the witness for a "yes" or "no" answer even if neither is appropriate. The following exchange gives a good illustration of this questioning style:

| Bin Raymond: | Is a citizen driving from Baltimore in the dark a.m. hours reason [sic] to be suspicious? |
| Tpr. Johnson: | It depends. |
| Bin Raymond: | Yes or no. Is it? Is it not? |
| Tpr. Johnson: | Yes. |

(Apr. 28, 2009, Tr. 147:23 - 148:1.) Citing this excerpt from the Suppression Hearing, Bin Raymond then argues in his brief, "It should be noted by the court that this officer believes *any* citizen driving from Baltimore at night is suspicious." (Def.'s Br. 14.) In fact, Trooper Johnson, when not pressed to pick one of Bin Raymond's answers, consistently adhered to the idea that the total of the indicators were what led him to a reasonable suspicion of criminal activity.

20

reasonable suspicion is a fluid concept that escapes codification, and the factors Trooper Johnson emphasized most in his testimony (the long trip of short duration, the conflicting stories, and the criminal histories) are such strong indicators that it is unlikely the black bag and the absent vehicle owner were what tipped the balance in establishing reasonable suspicion. Third, and most importantly, Bin Raymond spent a large part of the 26 hours of the Suppression Hearing poring over each suspicious factor in isolation, completely misapplying the "totality of the circumstances" test.

Bin Raymond approaches the reasonable suspicion test with mathematical precision. In his brief he argues:

> Altogether, without further explanation by the officer as to how each or in sum total, these items amount to reasonable suspicion, they simply equate to: Two men with arrest records, traveling the interstate in a vehicle co-owned by one occupant and his wife, with a black bag in the rear, the other occupant unknowingly having a suspended license and returning to Ohio from Maryland. Remove Sullivan from this equation and there is even less.

(Def.'s Br. 14.) The question is not how each factor *or* the sum total of the factors amount to reasonable suspicion. It is *only* the whole, not its individual constituents, that establishes reasonable suspicion. Bin Raymond incorrectly views Sullivan as a removable variable in an equation.

The name in which the vehicle was registered, for example, was a recurring theme during the Suppression Hearing because it was the one factor that was most consistent with innocent travel. The vehicle license plate query revealed the owner of the van to be Mary Taylor. (Def. Ex. F.) Bin Raymond told Trooper Johnson that Mary Taylor was his wife. He even produced his marriage license at the Suppression Hearing. (Def. Ex. G.) Although Bin Raymond told Trooper Johnson that the van was registered to his wife, Trooper Johnson testified to the fact that the vehicle query revealed a name different from the Defendant's "piqued [his] interest because the owner of the

21

vehicle wasn't there." (Apr. 28, 2009, Tr. 144:1-2.) Trooper Johnson definitely noticed that Bin Raymond did not have the same last name as his wife. (Apr. 28, 2009, Tr. 144:4.) But Trooper Johnson readily admitted that the vehicle owner's absence was not an overwhelming factor in his determination of reasonable suspicion. He described the absent driver as "not something you can totally hang your hat on" (Apr. 28, 2009, Tr. 144:11), but rather something that only seems significant in the context of other indicators. Trooper Johnson said a spouse driving a vehicle registered to another spouse was not "in and of itself" suspicious but when "[c]oupled with other things" did arouse some suspicion. (Apr. 28, 2009, Tr. 147:18-22.) The Court finds that under the "totality of the circumstances," the name in which the vehicle was registered did properly contribute, albeit not to an overwhelming degree, to establishing reasonable suspicion.

Certainly a woman keeping her maiden name after marriage is not only consistent with innocent behavior but a continuation of the trail boldly blazed by women's rights activist and suffragette Lucy Stone[13], though American women who do so are still a distinct minority[14]. However, in the context of the stop, the fact that the vehicle was registered to someone not present, and that person had a different name than Bin Raymond, was of interest to Trooper Johnson, especially when combined with all of his other observations. Although Trooper Johnson did not

---

[13] Lucy Stone retained her surname upon her marriage to Henry Blackwell in the mid-19th century, and other women following in her footsteps have often been referred to as "Lucy Stoners." Shirley Raissi Bysiewicz and Gloria Jeanne Stillson MacDonnell, *Married Women's Surnames*, 5 Conn. L. Rev. 598, 600-601 (1972-73). *See also* Lucy Stone League, http://www.lucystoneleague.org.

[14] *See* Gretchen Gooding and Rose Kreider, *With This Name I Thee Wed: Women's Marital Naming Choices*, Annual meeting of the Population Association of America, New York, NY, March 29-31, 2007, *available at* http://paa2007.princeton.edu/download.aspx?submissionId=70879 (study revealing that 93% of American-born married women in this country had the same surname as their husbands and that non-conventional use of a surname was more common with women who were "younger, had at least a bachelor's degree, were older than their husbands, were at least 10 years younger than their husbands, or with ancestry in Spanish, Latin American, or other Hispanic countries and Asian, Pacific Islands, or Australian ancestry").

have proof at the time of the stop that Bin Raymond was married to Mary Taylor (Apr. 28, 2009, Tr. 144:14-17), there was never any indication that Trooper Johnson seriously doubted that Mary Taylor was Bin Raymond's wife. *Cf. United States v. Solorio*, 78 Fed.Appx. 696, 700-701 (10th Cir. 2003) (where there was reason to question defendant's relation to absent vehicle owner because the vehicle was registered to a married woman, and defendant told officer that he was the woman's boyfriend). But the absent person likely would have been of less interest if Mary Taylor were actually named Mary Bin Raymond. And if a Mary Bin Raymond had been the driver the night of May 21, 2007, the vehicle's registration would not have contributed to a reasonable suspicion upon Mary Bin Raymond's explanation that she had changed her name upon marriage. *See United States v. Richardson*, No. 95-4039, 1995 WL 623377, at *13 (10th Cir. 1995) ("Perceiving a divorcee's prior married name as a suspicious circumstance [even under a totality of the circumstances analysis] casts a considerable percentage of the American female population into suspicion given the frequency with which women in our society change their names upon marriage.").

The absent Mary Taylor was the most innocuous of the indicators that night, but even that in the totality of the circumstances contributed slightly to reasonable suspicion. Understandably, indicators such as the two individuals' criminal histories, differing stories about the purpose of the trip to Baltimore and what they did there, and the fact that the round-trip journey took more time than the stay in Baltimore contributed even more so.

Bin Raymond also has a preconceived list of drug trafficking indicators, such as "aftermarket compartments, possibly missing seats, [and] aftermarket tint." (Def.'s Br. 13.) Multiple cell phones, air fresheners, and large rolls of cash are also, in Bin Raymond's mind, articulable facts that support reasonable suspicion. (Apr. 28, 2009, Tr. 128:10-14; 129:4-15.) As Bin Raymond's argument seems

23

to go, since none of these specific items were visible the night of the stop, Trooper Johnson could not possibly have had reasonable suspicion to detain Bin Raymond and Sullivan. This argument is without merit for two reasons. First, Bin Raymond offers no support for the notion that the factors he himself has come up with comprise an exhaustive list of drug trafficking indicators.[15] Second, Trooper Johnson actually disagreed with Bin Raymond that any one of these items that Bin Raymond views as a telltale sign of drug trafficking would in and of itself be enough to establish reasonable suspicion. (Apr. 28, 2009, Tr. 129:9-15.)

In addition to not appreciating the "totality of the circumstances" test, Bin Raymond advances the argument that Trooper Johnson had nothing more than a "hunch" because at the preliminary hearing he stated, "I don't know if I can say that I made observations. I would say that I began to think something was going on." (May 19, 2009, Tr. 42:20-22 (quoting preliminary hearing transcript).) Bin Raymond then generates semantic confusion as to what an "observation" is. Trooper Johnson testified that to him an "observation" is something "visual." (May 19, 2009, Tr. 44:1.) Bin Raymond concludes that because Trooper Johnson began to "think" criminal activity was afoot and testified that to him "observation" and "thinking" are different, all Trooper Johnson had was a "hunch." (Def.'s Br. ¶ 67.) This argument conveys nothing more to the Court than that Bin Raymond believes an "observation" capable of establishing reasonable suspicion must be a physical object possessed overwhelmingly by drug traffickers. His belief is without any legal or logical foundation.

---

[15] Bin Raymond offers no authority for the notion that his list of indicators is comprehensive. On the other hand, Trooper Johnson has been trained to recognize indicators of criminal activity. (Def. Ex. P.)

### F.    CANINE SNIFF

Trooper Johnson and Marko were certified in the detection of marijuana, hashish, cocaine, cocaine base, heroin, and methamphetamine. (Gov. Exs. 1-2.) After detaining Bin Raymond and Sullivan upon reasonable suspicion of criminal activity, Trooper Johnson conducted a canine sniff of the car.[16] First Marko made a "fast pass," in which the officer "travel[s] around the vehicle at a near run to engage the dog and expose it to the vehicle" (May 19, 2009, Tr. 172:2-3), followed by a detailed inspection of the exterior of the vehicle (Apr. 28, 2009, Tr. 37:22-23). During the "fast pass," Marko alerted at the center console inside the van and also outside the right front passenger door. (Apr. 28, 2009, Tr. 33:13-17.) Troopers Johnson and Volk then placed Bin Raymond and Sullivan under arrest and applied for a search warrant for the vehicle.

There is nothing remarkable about a canine sniff of the exterior of a vehicle during a traffic stop even absent reasonable suspicion that the vehicle contains contraband. *Caballes*, 543 U.S. at 409 (finding no cognizable constitutional infringement where officer conducted canine sniff on exterior of defendant's car while defendant was lawfully seized for a traffic violation). In this case, the traffic stop had been completed, and Bin Raymond was lawfully seized based on a reasonable suspicion that criminal activity was afoot. Therefore, the canine sniff of the exterior of the vehicle was not a search within the meaning of the Fourth Amendment. *Id.* at 408 (noting that "[o]fficial conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment" (internal quotation marks removed)).

---

[16] On the Turnpike, Trooper Johnson informed Bin Raymond that he was going to "search the vehicle." At the Suppression Hearing, in response to Bin Raymond's questioning, Trooper Johnson clarified that he only intended to search the exterior of the car. (May 19, 2009, Tr. 99:9-10.) Despite Marko's entry into the vehicle, the record does not suggest that Trooper Johnson intended to search anything more than the vehicle's exterior.

25

What is different about this canine sniff is the fact that it migrated to the interior of the vehicle through the driver's door, which stayed open after Bin Raymond exited the vehicle. Sullivan had previously exited the vehicle from that door, and he closed it behind him immediately. (Def. Ex. E.) Bin Raymond, on the other hand, was ordered to leave the vehicle on his own or be extricated, and immediately upon exiting the vehicle he was ordered to place his hands on the roof of the van. (Def. Ex. E.) Bin Raymond did not have an opportunity to close the door. After being patted down, Bin Raymond was ordered to stand by Trooper Johnson's vehicle. (Def. Ex. E.) The driver's door remained open. During the fast pass, Marko entered the van through the open driver's door and alerted to the center console. (Apr. 28, 2009, Tr. 33:13-14.)

Other courts have addressed canine sniffs that migrate from the outside to the inside of the vehicle. In *Hutchinson*, 471 F.Supp.2d at 500, the drug-detecting canine leapt through the open driver's window into the vehicle. The court in *Hutchinson* canvassed caselaw on this subject and found the consensus among courts to be that "a canine sniff that migrates from outside a car . . . to the interior does not constitute a violation of the Fourth Amendment provided that the canine makes entry into the suspect vehicle of its own initiative and is neither encouraged into nor placed in the vehicle by a law enforcement officer." *Id.* at 506. In *United States v. Pierce*, No. 08-126-JJF, 2009 WL 255627, at *3 (D. Del. Feb. 2, 2009), the drug-detecting dog entered an open driver's door during an exterior canine sniff. The court in *Pierce* concluded that the canine's behavior was unprompted and instinctive and did not transform the canine sniff into a search within the meaning of the Fourth Amendment. *Id.* at *6. Similarly, the record here supports the Court's conclusion that Marko entered the vehicle on his own without any encouragement from Trooper Johnson.

Bin Raymond attempts to involve Trooper Johnson in Marko's entry into the vehicle by

26

making him responsible for the fact that the driver's door remained open. Bin Raymond finds it significant that he never wanted the door open in the first place:

> Bin Raymond:     So Mr. Bin Raymond did not voluntarily open
>                  the driver's door, correct?
> Tpr. Johnson:    You did so under your own power, yes.

(May 19, 2009, Tr. 72:3-5.) When Bin Raymond exited the vehicle, his back was turned to Trooper Johnson and also to the open door. (May 19, 2009, Tr. 74:17-18.) Trooper Johnson testified that Bin Raymond "had easy access to the door" while he was being patted down with his hands on the roof of the van (May 19, 2009, Tr. 74:19-20), that Bin Raymond "had every opportunity" to shut the door upon exiting the van (May 19, 2009, Tr. 75:16-17), and that Bin Raymond "could have asked [Trooper Johnson] to shut the door" (May 19, 2009, Tr. 75: 23-24). From watching the video and the nature of Trooper Johnson's interaction with Bin Raymond, and having established that Bin Raymond was seized at that point, the Court finds that Bin Raymond had none of those options. Bin Raymond was ordered from the vehicle by a law enforcement officer and immediately told to turn around and place his hands on the roof of the van. Bin Raymond had a fraction of a second to think about shutting the door. He could not have conceivably closed the door during that instant.

Nevertheless, the Court does not find that the Government in any way interfered with the vehicle or schemed to allow Marko's ingress. Bin Raymond's argument that Trooper Johnson controlled the door is based on Bin Raymond's view that "Tpr. Johnson controlled the defendant, Sullivan, the vehicle and the area from the time he activated his patrol lights until defendant was placed in custody. It was due to Tpr. Johnson's physical actions and verbal orders that the door was left open." (Reply 14.) Leaving aside the fact that there was a break in Trooper Johnson's control over Bin Raymond, Sullivan, the vehicle, and the area when he ended the traffic stop, the control

27

Trooper Johnson exercised is too attenuated to transform the canine sniff into a search. The record simply does not support Bin Raymond's theory that Trooper Johnson "aided and/or assisted the defendant's exit by pushing open the vehicle door and leaving it; an act done solely for the purpose of facilitating the canine's entry into the vehicle." (Def.'s Br. 22.) While the Court understands perfectly well why the door remained open, it was Bin Raymond himself who opened it. Ordering Bin Raymond to exit the vehicle was proper. *Mimms*, 434 U.S. at 111 (finding that ordering a driver out of a car is a *de minimis* intrusion on the individual's personal liberty). Bin Raymond concedes that he could not decline to get out of the van. (Def.'s Br. ¶ 46.) But Bin Raymond fails to make the connection between his inability to decline Trooper Johnson's order and Trooper Johnson's facilitating Marko into the van. Bin Raymond's assertions that Marko entered the vehicle because the door was open, and the door was open because Trooper Johnson ordered Bin Raymond out of the vehicle, do not lead to the conclusion that Trooper Johnson encouraged Marko to enter the vehicle.

Trooper Johnson's conduct with regard to the driver's side door is easily distinguishable from that of the border patrol agent in *United States v. Winningham*, 140 F.3d 1328 (10th Cir. 1998), a case Bin Raymond mistakenly finds analogous to the one *sub judice*. In *Winningham*, the agent himself opened the sliding door of a van and then left it open. *Id.* at 1329. The defendant had no role in the sliding door's opening because he had been ordered away from the van. *Id.* The Tenth Circuit in *Winningham* found that since the officers themselves had opened the van's sliding door and left it open for six minutes before the canine unit arrived, "[a] desire to *facilitate* a dog sniff of the van's interior . . . seem[ed] readily apparent." *Id.* at 1331. The Court is unable to infer any such desire from Trooper Johnson's conduct. Trooper Johnson did not open the door, and he began the

canine sniff mere moments after the door was opened. (Def. Ex. E.)

Moreover, in addition to indicating at the center console, during the fast pass Marko also indicated at the right front passenger door, which was closed. (Apr. 28, 2009, Tr. 33:16-17; 37:12-13.) The holdings of *Hutchinson* and *Pierce* certainly did not hinge on the fact that an exterior alert occurred just before the dog somehow found its way into the vehicle. In both cases, however, there was an external canine alert just before the dog leaped into the vehicle, or at least the courts generously inferred one. In *Pierce*, the dog "alerted at the [partially open passenger] window by excitedly jumping up and down and sniffing the dashboard of the vehicle's interior [and] ... poked his nose through the partially open window but did not enter the car." *Id.* at *2. In *Hutchinson*, the court confessed it was "initially troubled that [the dog] did not so much conduct an exterior sniff . . . but instead apparently entered into the car via an open window prior to alerting to the duffel bag on the back seat." 471 F.Supp.2d at 505. However, the court in *Hutchinson* ultimately concluded that the dog "made entry into the Grand Am after smelling the odor of marijuana – an odor he first detected outside the vehicle before he entered through the driver's window." *Id.* at 510. Here, while Marko's first positive alert was on the interior of the van[17], it was immediately followed by an alert at the closed passenger door. That external alert alone would have supported a probable cause determination. The courts in *Hutchinson* and *Pierce* appeared to be somewhat reassured by the accompanying external alert, but not because of the order in which it occurred. Here, there was a distinct external alert in addition to the internal one, a fact that mollifies the Court's natural discomfort with the internal alert. The Court therefore concludes that the canine sniff was conducted

---

[17]     Bin Raymond:    Marko's initial positive indication was on the interior of the van, was it not?
        Tpr. Johnson:    Yes.
(May 19, 2009, Tr. 173:18-20.)

29

within the scope of the Fourth Amendment.

IV. **CONCLUSION**

The traffic stop on May 21, 2007, was a lawful one that did not result in any Fourth Amendment violations. Following the traffic stop, a consensual encounter ensued with Sullivan and Bin Raymond during which Trooper Johnson developed reasonable suspicion that criminal activity was afoot. A second brief detention occurred that also resulted in no Fourth Amendment violation. Trooper Johnson, through his dog Marko, conducted a canine sniff of the vehicle during this second detention. The dog's entry into the vehicle did not transform the canine sniff into a search within the meaning of the Fourth Amendment. As a result, the Court concludes that Bin Raymond's Motion to Suppress Evidence is without merit and must be denied. The following Order will issue:

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress Evidence (Doc. No. 45) is **DENIED**.

**BY THE COURT:**

June 25, 2010

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**